# Richmond

John W. B. Deeds, Receiver, B. C. Sales Company, Inc., Pulaski Veneer Corporation, and T. C. Coleman v. H. C. Gilmer, Receiver, Fireproof Wood Products Corporation, A. E. Boger, et als., and A. E. Boger v. H. C. Gilmer, Receiver, et als.

April 11, 1934.

Present, Campbell, C. J., and Holt, Epes, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

Deeds et al. v. Gilmer et al.:

*John S. Draper* and *S. B. Campbell,* for the appellants.

*Gilmer, Wysor & Gilmer,* for the appellees.

Boger v. Gilmer et al.:

*Dalton & Jordan* and *W. J. Henson,* for the appellant.

*S. B. Campbell* and *John S. Draper,* for the appellees.

EPES, J., delivered the opinion of the court.

The decree here appealed from was entered on July 18, 1932, in a consolidated cause composed of two chancery suits in which A. E. Boger was one of the defendants and several attachment proceedings against Boger as principal defendant, and Pulaski Veneer Corporation, B. C. Sales Company, Inc., and T. C. Coleman as codefendants, which have been transferred from the law to the chancery side of the court. During the pending of the proceedings John W. Deeds was appointed receiver for B. C. Sales Company, Inc., and had himself made a party to the several proceedings in which B. C. Sales Company, Inc., was a party.

John W. Deeds, receiver of B. C. Sales Company, Inc., Pulaski Veneer Corporation and T. C. Coleman filed their petition for an appeal from this decree and presented therewith a transcript of the voluminous record in the consolidated cause.

After this petition had been filed, but before it had

been acted upon by the court or any of the justices, A. E. Boger filed his petition for an appeal from the same decree. He did not file with his petition a transcript of the record, but in it he made reference to the petition filed by John W. Deeds, and others, and prayed that the transcript of the record filed with that petition might "be read in connection with this petition" and that the court would "treat this petition as a cross-assignment of error to this decree."

An appeal was allowed to John W. Deeds, receiver, and his co-petitioners, and a few days later an appeal was also allowed to Boger.

We are met at the outset with a motion made by the appellants in the original petition to dismiss Boger's appeal as having been improvidently awarded, because he did not present with his petition a transcript of the record as required by section 6339, Code Va. 1919.

This motion presents purely a moot question, a discussion of which is without point here. Boger was a party defendant to the original petition for an appeal, and Boger's petition is certainly a good assignment of cross-error, regardless of whether the *appeal* allowed him was improvidently awarded or not.

All the suits and proceedings composing this consolidated cause grew out of the failure of Fireproof Wood Products Corporation, which had its principal place of business and plant at Pulaski, Virginia. For convenience and brevity we shall often hereafter speak of this corporation as the Fireproof Corporation.

This corporation was incorporated under the laws of Virginia on November 17, 1928, at the instance of the Safety Fireproofing Products Corporation of New York, and whatever capital was put into it was put in by the New York corporation. A. E. Boger represented the New York corporation in procuring the incorporation of Fireproof Corporation, was named in its certificate of incorporation as one of its officers, and after its incorporation was in charge of its management and operations.

Immediately after it was incorporated, in accordance with a pre-incorporation contract, Fireproof Corporation purchased from H. C. Gilmer, receiver of Cheves Lumber Company, Inc., a parcel of land in the town of Pulaski, Virginia, with a woodworking plant thereon, for $35,000. The whole purchase price was payable in deferred installments, to secure the payment of which the corporation conveyed the property to J. L. Wysor, trustee.

For several months it operated this plant on a somewhat extensive scale under the management of A. E. Boger; but early in January, 1929, it closed down and leased its plant to lessees with whom we are not here concerned.

In addition to the debt owed by it to H. C. Gilmer, receiver of Cheves Lumber Company, Inc., during its operations it became indebted to the following creditors: W. F. White; D. A. Smith, receiver of Rocky Gap Flooring Company; Pulaski National Bank; F. L. Quesenberry; Pulaski Engineering Works; Midland Valley Lumber Company; Virginia Hardwood Lumber Company; James McGraw, Inc.; and Standard Oil Company of New Jersey. There may be other creditors, but if so they do not appear from the record and we are not here concerned with them.

In June, 1929, it had become evident that the Fireproof Corporation was hopelessly insolvent, and that its sponsor (Safety Fireproofing Products Corporation) would not put any more capital into it. When this became evident the suits and attachment proceedings which compose this consolidated cause were instituted.

On July 3, 1929, H. C. Gilmer, receiver of Cheves Lumber Company, Inc., filed his bill in chancery against Fireproof Wood Products Corporation, A. E. Boger, J. L. Wysor, trustee, and certain other persons whom it is not necessary to mention here.

This bill alleges that the Fireproof Corporation is insolvent; that it is indebted to H. C. Gilmer, receiver of Cheves Lumber Company, in the sum of $35,000, which is secured by a purchase money deed of trust from it to

J. L. Wysor, trustee, conveying its real estate and plant in Pulaski, Virginia, and is also indebted to other creditors, who, however, are not named; that A. E. Boger is liable to the Fireproof Corporation for the mismanagement of its properties and for sums which were improperly withdrawn by him from the corporation. It also contains this allegation with reference to misrepresentations made by Boger to the complainant.

The complainant "further alleges that Fireproof Wood Products Corporation was formed through the direct activities of A. E. Boger, who was representing himself and Edward Schaffer, and * * * Wright, of New York City, and that it was upon the representations made by said Boger in his individual capacity and as representing these New York persons that the contract of October 11, 1928, was based, and these representations were a direct and controlling inducement to the entering into that contract on the part of your complainant; * * * and these representations were that these promoters of Fireproof Wood Products Corporation would put capital enough into the operating corporation to be formed pursuant to that contract to cover all the values of the properties to be transferred under that contract, and a large additional amount.

"These representations were carried by said A. E. Boger into a newspaper publication in the town of Pulaski and were made to the mayor of Pulaski, who was interested in his capacity as mayor in the enlarged industry of the community. They were also made to the bankers of the town of Pulaski, and upon these representations, certain of the bankers extended credit to this corporation, and made representations in good faith to prospective creditors of the corporation. These representations have not been fulfilled.

"Your complainant avers that he relied upon them in reporting to your honor's court and recommending as receiver of Cheves Lumber Company, Inc., the sale of the assets of Cheves Lumber Company, as set forth in that report, and as subsequently ratified by decree of

your honor's court. And for that reason, your complainant made the sale and on unusually liberal terms as the deed of December 3, 1928, will show."

While the bill states in the above quotation that Boger made these representations to other creditors of the corporation, it does not name the other creditors to whom such representations were made, or state a case for any of them upon which he could recover.

The prayer of the bill, in so far as it is here material, reads:

"The prayer of your complainant is * * * that a receiver be forthwith appointed to take charge of the properties [of Fireproof Wood Products Corporation]; * * * that said A. E. Boger be required to furnish an accounting of his transactions personally with Fireproof Wood Products Corportion and its affairs, business and assets, and that he be required to account personally to the creditors of said Fireproof Wood Products Corporation on the basis of all moneys which he may have received from it, and on all representations and promises he may have made to induce others to extend credit to said corporation; [and] that all creditors of said Fireproof Wood Products Corporation be permitted to join as complainants in this suit as a general creditors' suit."[1]

On July 5, 1929, the judge entered a vacation order appointing H. C. Gilmer receiver of Fireproof Wood Products Corporation. The order contains this provision:

"The said receiver is hereby given complete authority and direction to institute and conduct all suits, actions and other litigation for the purpose of liquidating the af-

---

[1] This bill is a curious hybrid. In addition to being a general creditors' suit against the Fireproof Corporation it seeks to enforce a liability of Boger to the Fireproof Corporation, and also to have Boger held liable in damages to the complainant and to the other creditors of the Fireproof Corporation severally to the amounts of the several debts due to them by that corporation, on the ground that Boger deceived and defrauded them severally by making false and fraudulent representations to them as inducements to them to grant the corporation credit. However, no objection seems to have been made to the bill on this ground.

fairs of Fireproof Wood Products Corporation, *and of holding any individuals therewith connected responsible personally for the indebtedness of the corporation,* including the right to proceed against the promoters and stock subscribers to the capital stock of said corporation for the unpaid portions thereof to an amount sufficient to pay the purchase price agreed to be paid to the receiver of Cheves Lumber Company, Inc., and to cover the inventory values agreed upon under the said contract of October 11, 1928, and also to pay all the general indebtedness of said Fireproof Wood Products Corporation." (Italics ours.)

On July 3, 1929, W. F. White filed a petition for an attachment against both the Fireproof Corporation and A. E. Boger as principal defendants. The petition alleged that the Fireproof Corporation was indebted to White in the amount of $1,955.79 for lumber sold by him to it and had committed acts which were grounds for an attachment against it; and that Boger also was personally liable to him in damages for that amount because he had fraudulently induced him to grant that amount of credit to the Fireproof Corporation by making to him certain false and fraudulent representations. The false and fraudulent representations alleged are the same as those alleged in the bill filed by Gilmer, receiver for Cheves Lumber Company, and are copied practically verbatim from the allegations in that bill which are above quoted. The petition names Pulaski Veneer Corporation and C. E. Richardson, its secretary and treasurer, as persons who are indebted to Boger, makes them codefendants, and prays that they be required to answer and disclose the sums owed by them to Boger, but it makes no allegations as to upon what account they are indebted to him.

The ground of attachment alleged against Boger in this and all the other petitions for attachment hereafter mentioned is that he is a nonresident, which is an admitted fact.

On the same day (July 3) D. A. Smith, receiver of Rocky Gap Flooring Company, filed a petition for an attachment against both the Fireproof Corporation and A. E. Boger as principal defendants, naming Pulaski Veneer Corporation and C. E. Richardson as persons who are indebted to Boger. The allegations and prayers of this petition were practically the same as those of White's petition, except that the amount of the debt which he alleged was due him by the corporation and the damages for which he alleged Boger was liable to him were stated as being $3,950.

Attachments issued on these two petitions, returnable to first September rules (September 2), 1929, and copies thereof were served upon the codefendants on July 3, but they were not served upon Boger either by personal service or by order of publication.

This petition of D. A. Smith was subsequently removed, by the defendant Boger, to the United States District Court, and was then dismissed by the plaintiff without prejudice, and need not be further noticed.

On July 11th a pleading, which is therein styled a petition but is in reality a bill to set aside an assignment of a contract on the ground that it was made by Boger with intent to defraud his creditors, and also for an injunction and a discovery, was filed before the judge in vacation. This bill (petition), which we shall hereafter refer to as the injunction bill, reads as follows:

"Your complainant, H. C. Gilmer, receiver of Fireproof Wood Products Corporation, would respectfully show unto your honor:

"That on the 5th day of July, 1929, by your honor's decree entered in the clerk's office of the Circuit Court of Pulaski county, in the suit of H. C. Gilmer, receiver of Cheves Lumber Company, Inc., your complainant was appointed receiver of Fireproof Wood Products Corporation, and on that day filed his bill as receiver of Cheves Lumber Company, Inc., which is thereto attached, and

asked to be read as a part of this petition marked Exhibit A.[2]

*"From reading of Exhibit A, your honor will see that Fireproof Wood Products Corporation owes H. C. Gilmer, receiver of Cheves Lumber Company, Inc., the sum of $35,000 with interest thereon from January 3, 1929, and certain other charges, and owes other debts to sundry creditors in large amounts, and said A. E. Boger and his brother, T. E. Boger, Jr., are charged with personal liability along with Edward Schaffer, and * * * Wright, for the indebtedness asserted in said bill;* shortly before the said decree was entered, D. A. Smith and W. F. White, trading as W. F. White Lumber Company, upon their several petitions sued out attachments on indebtedness which they severally asserted Fireproof Wood Products Corporation, A. E. Boger, T. E. Boger, Jr., * * * Wright and Edward Schaffer, and had the said attachments served upon Pulaski Veneer Corporation and C. E. Richardson, among others, as garnishees owing A. E. Boger, and having estate and property of A. E. Boger in their hands respectively. These attachments are returnable to the first day of the September term of your honor's court, 1929, and certified copies thereof are hereto attached, together marked Exhibit B, and asked to be read along with the petitions, as a part of this petition.

"Your complainant has learned since his appointment as receiver of Fireproof Wood Products Corporation, and since the issue and levy of said attachments, that A. E. Boger, a short time prior to the issue of said attachments and to the appointment of H. C. Gilmer, receiver, having entered into a written contract with Pulaski Veneer Corporation, under which the said corporation agreed to pay said A. E. Boger, certain commissions, as your complainant is informed five per cent, on orders received from, and sales made to The Victor Talking Machine Company, and

---

[2] This is the bill heretofore set forth in pursuance of the prayer of which Gilmer was appointed receiver for Fireproof Wood Products Corporation.

its subsidiary or affiliated companies. At that time or at about the same time, said A. E. Boger formed, or had formed, a Delaware corporation known as B. & C. Sales Corporation, and shortly thereafter assigned said contract between him and the Veneer Corporation to the B. & C. Sales Corporation.

"Your complainant avers that said A. E. Boger procured the formation of said corporation for the purpose of transferring his sales commission arrangement with the Pulaski Veneer Corporation in such a way as to place the indebtedness then existing or thereafter to accrue to him from said Pulaski Veneer Corporation, *beyond the reach of the creditors of said A. E. Boger, and especially beyond the reach of your complainant in this suit, and of H. C. Gilmer, receiver, of Cheves Lumber Company, Inc., and of the attaching creditors above named, and all other petitioning creditors hereinafter named,* and by this scheme is attempting to conceal his property and place it beyond the reach of his creditors.

"Your complainant further avers that said A. E. Boger is, in line with the same purpose, absenting himself from the State of Virginia.

*"Other known creditors of Fireproof Wood Products Corporation are as follows:*

"James McGraw, Inc., Richmond, Va.............$118.74
Standard Oil Company of New Jersey.............. 48.34
Virginia Hardwood Lumber Co., Inc............... 300.42
Midland Valley Lumber Company, Inc............. 278.92
Pulaski Engineering Works...................... 221.66
F. L. Quesenberry............................... 599.14

"With average interest on all of said claims from January 1, 1929.

*"These last named creditors, together with said attaching creditors, D. A. Smith and W. F. White, trading as White Lumber Company, ask leave to join in this petition, and to have their claims asserted with respect to all the remedies herein asked for and without waiving any rights or remedies asserted or asked for in the other proceedings in your honor's court above referred to.*

"Your complainants aver that said B. & C. Sales Corporation is nothing more than a nominal corporation formed for the purpose of receiving from Pulaski Veneer Corporation commissions accruing to said A. E. Boger under the contract between him and said Veneer Corporation, and disbursing the same to A. E. Boger. Whether any other persons are to a small extent interested in said corporation and in the plan to have commissions distributed through it, your petitioners do not know, but ask that this be treated as a bill of discovery for the purpose of finding out.

"Your petitioners further aver that any payments made by Pulaski Veneer Corporation or by C. E. Richardson, garnishee, under the attachments aforesaid to said B. & C. Sales Corporation or to any other instrumentality set up by A. E. Boger for the purpose of fencing off his creditors would be, and, if already made, have been in violation of the mandate of said attachment.

"The premises considered, the prayer of your petitioners is that A. E. Boger, T. C. Coleman, C. E. Richardson and Pulaski Veneer Corporation, and said B. & C. Sales Corporation, a nonresident corporation, and the Victor Talking Machine Company, a foreign corporation, be made parties defendant to this petition, and required to answer the same, but not on oath, that being waived; *that your honor will forthwith enter an order forbidding said Pulaski Veneer Corporation and C. E. Richardson, jointly and severally, to pay over to A. E. Boger or to said B. & C. Sales Corporation, or to any of the agents of either, any moneys which may accrue by reason of the said contract between said Veneer Corporation and A. E. Boger,* between now and the return day of said attachments and a full disclosure thereon, and to account for any moneys, if any, that may have been paid to the said B. & C. Sales Corporation by either or both of them since said attachments were levied; that said A. E. Boger and T. C. Coleman severally be required to file a copy of the charter and all minutes and proceedings of said B. & C. Sales

Corporation and disclose who are the owners of said corporation, and in what proportions; that said Pulaski Veneer Corporation be required to make the same disclosures herein as are required in said attachments, and to state on oath to what extent it is indebted either to said A. E. Boger or to said B. & C. Sales Corporation for the period beginning July 3, 1929, and ending on the return day or hearing day of said attachments; *that all other creditors of said A. E. Boger or Fireproof Wood Products Corporation be permitted to unite in this petition as in a general creditors' suit under the ordinary provisions as to payment of costs, etc., that all necessary accounts be taken and reported, and that your petitioners may have applied to their several debts ratably all moneys due or to become due said A. E. Boger, and to B. & C. Sales Corporation to and including the return and hearing day of said attachments.*

"That this suit be consolidated, so far as may be proper with the suit of *H. C. Gilmer, receiver of Cheves Lumber Company* v. *Fireproof Wood Products Corporation and others,* and with said attachment suits and any other attachment proceedings now pending in your honor's court; and that your petitioners may have all such other, further and general relief as the nature of their case may require, and as may be agreeable to equity and good conscience; and they will ever pray, etc.

"H. C. GILMER,
 Receiver of Fireproof Wood Products Corp.,
JAMES MCGRAW, INC.,
STANDARD OIL COMPANY OF NEW JERSEY,
VIRGINIA HARDWOOD LBR. COMPANY,
MIDLAND VALLEY LUMBER COMPANY,
D. A. SMITH,
W. F. WRIGHT,
PULASKI ENGINEERING WORKS,
F. L. QUESENBERRY.

"GILMER & WYSOR, p. q." (Italics ours.)

The bill (petition) is sworn to by H. C. Gilmer.

It may be here noted that H. C. Gilmer, receiver of Cheves Lumber Company, is not a party plaintiff or defendant to this injunction bill. Apparently H. C. Gilmer, in his official capacity as receiver of Fireproof Wood Products Corporation, was attempting to enforce in this injunction bill the claims asserted against Boger by H. C. Gilmer, receiver of Cheves Lumber Company in the bill theretofore filed by him against the Fireproof Corporation, Boger and others, without subjecting himself as receiver of Cheves Lumber Company to the risk of becoming liable by reason of the issuance of the injunction prayed.

While James McGraw, Inc., Standard Oil Co., Virginia Hardwood Lumber Co., Inc., Midland Valley Lumber Co., Inc., Pulaski Engineering Works and F. L. Quesenberry join as parties complainant in the injunction bill (petition), the only rights which the bill can be said to plead that they have as against Boger are that they are entitled to have the receiver of Fireproof Wood Products Corporation recover from Boger any sums that may be owing by him to that corporation and to share *pro rata* in whatever the receiver collects for Fireproof Wood Products Corporation from him. There is no allegation in the bill, or in any other pleading filed in this consolidated cause until long after the injunction granted had expired, in which any of these last mentioned six parties states, or purports to state, any individual claim or cause of action against Boger.

It may be further noted here that Pulaski National Bank (which later filed an attachment against Boger) was not a party plaintiff or defendant to the injunction bill, and was never made a party to it by any pleading thereafter filed.

The injunction bill (petition) was presented to the judge without notice to any of the defendants therein named and the judge forthwith (July 11th) entered a va-

cation order granting an injunction, the material parts of which read:

"It is ordered and decreed that C. E. Richardson and Pulaski Veneer Corporation be and they are hereby forbidden to pay to said A. E. Boger or to said B. & C. Sales Corporation or to any other person for or on behalf or in the interest of said A. E. Boger, any moneys from whatever source derived owing to said Boger or to said Sales Corporation on July 3, 1929, the day on which said attachments were levied or accruing to him between that date and the date of this order, and to accrue to him or to said corporation until the return day of said attachments, and the time of the hearing thereof, and a full disclosure. And said B. & C. Sales Corporation, as well as said garnishees, is hereby required to appear on the 2d day of September, 1929, or as soon thereafter as a hearing can be had and disclose on oath to what extent it is indebted to the said A. E. Boger, and what estate and property, if any, of said Boger it has in its possession; that said Sales Corporation, A. E. Boger and T. C. Coleman be and they are hereby severally required to answer said petition and make disclosures of the matters called for therein."

The injunction order did not require that an injunction bond should be given by any person. (See section 6324, Code Va. 1919.)

The appellants contend that it does not prescribe "the time during which such injunction shall be effective," as is required by section 6317, Code Va. 1919 (as amended by Acts 1922, chapter 445); but this contention is not well made. While it is inartificially stated the order makes it plain that the injunction is to remain in force until the return day of the attachments (September 2, 1929) and thereafter until there should be a hearing on them.

On September 2d the Fireproof Corporation filed its demurrer and answer to the petition of W. F. White for an attachment. This demurrer not only raises the point that no sufficient ground of attachment is stated against

the corporation, but it also raises the point that the petition states no cause of action against Boger individually. The answer denies the allegations of fraud and deceit alleged in the petition against Boger upon which it is sought to hold him personally liable. Boger swore to the answer filed by the corporation, but did not himself appear generally. He appeared specially and moved the court to dismiss White's petition as to him on the ground that no process had been served on him.

On September 6, 1929, the court entered on its law side an order, reciting that Pulaski Veneer Corporation and C. E. Richardson had appeared and "disclosed that they were not indebted to the Fireproof Wood Products Corporation or to A. E. Boger," and ordering that "the attachment [sued out by W. F. White] be dismissed as to the codefendants, Pulaski Veneer Corporation [and] C. E. Richardson." This order further recites that the court is not advised of its judgment upon the demurrer filed by the Fireproof Corporation or upon Boger's motion to dismiss the proceeding as to him, and takes time to consider these matters.

No further proceedings of any kind were had upon *this* petition of W. F. White for an attachment; and upon the entry of the above order any lien which may have existed by virtue of this attachment upon the funds involved in this cause expired.

However, on the same day (September 6th) W. F. White filed a petition against A. E. Boger as sole principal defendant. It does not purport to be an amendment of the petition which he had theretofore filed against the Fireproof Corporation and Boger, and makes no reference to it.

This petition names Pulaski Veneer Corporation, C. E. Richardson, B. & C. Sales Corporation, and T. C. Coleman as persons who are indebted to Boger and makes them codefendants; but it does not state how or on what accounts they are indebted to him.

It alleges that White extended credit to the Fireproof

Corporation to the amount of $1,955.79, which sum with interest thereon is still due to him from that corporation, which has become insolvent; that for the purpose of inducing him to grant credit to this amount to the corporation, Boger made to him the representations hereafter mentioned which were false and fraudulent; and that by "said false and fraudulent representations, the said A. E. Boger has defrauded and deceived your petitioner; and your petitioner has suffered damages by such fraud and deceit in the sum aforesaid with interest as aforesaid." The prayer of the petition is for a judgment and an attachment against Boger for the amount of $1,955.79 with interest, and that the codefendants be required to answer and disclose the amounts in which they are severally indebted to him.

The allegations as to false and fraudulent representations contained in White's petition read as follows:

"Immediately after the chartering of said corporation, said A. E. Boger, in order to secure credit for the corporation, and in order to induce creditors, and especially your petitioner, to extend credit to said corporation, represented to your petitioner that he had formed a million dollar corporation that would give immediate employment to 100 men, and ultimate employment to 500 men; that the corporation would manufacture 50,000 feet of flooring per day, and that he and his associates would at once put into the business of said corporation a sufficient amount of money to carry out these plans; that he and his associates would put not less than $50,000 into the capital of the corporation, and probably $100,000 at once; that Safety Fireproofing Corporation of New York City was a strong financial corporation, and would own eighty per cent of the stock of Fireproof Wood Products Corporation, and that the business would have large financial backing; that the plant would operate day and night.

"Your petitioner avers that, acting on the faith of these representations, and solely on account thereof, and in reliance thereon, your petitioner extended credit to said

Fireproof Wood Products Corporation to the amount of $1,955.79 with interest thereon from January 1, 1929, which amount is past due and payable.

"Your petitioner further avers that said Fireproof Wood Products Corporation, after remaining in business for a period of less than ninety days, became wholly insolvent; that neither said Boger nor his New York associates, nor the New York corporation referred to advanced a sufficient amount of capital to make it a going concern, and on or about the 1st day of February, 1929, said A. E. Boger and his associates practically abandoned the business and affairs of said corporation, and the indebtedness above set forth as due your petitioner remains unpaid.

"Your petitioner further avers that all the representations aforesaid made by A. E. Boger were made by him for the purpose of inducing your petitioner to extend credit to said Fireproof Wood Products Corporation; that they were wholly false, and that no one of them has been fulfilled, and that by said false and fraudulent representations, the said A. E. Boger has defrauded and deceived your petitioner, and your petitioner has suffered damages by such fraud and deceit in the sum aforesaid with interest aforesaid."

An attachment issued as prayed, returnable to the first day of the November term; and copies thereof were served upon Boger and all the codefendants on September 6th.

On its chancery side the court entered an order on September 6, which recites that the Fireproof Corporation filed its demurrer to the original bill filed by H. C. Gilmer, receiver of Cheves Lumber Company, and also that the Fireproof Corporation, T. C. Coleman, C. E. Richardson, Pulaski Veneer Corporation, and B. C. Sales Corporation filed their demurrers to the petition of H. C. Gilmer, receiver, which "demurrers are in writing and assign grounds of demurrer." The order does not pass upon the demurrers but merely recites that they were filed,

and continues the cause to a later day. These demurrers are not in the printed record or in the original record which has been sent up by the clerk of the court in response to a writ of *certiorari* issued by this court; nor does it otherwise appear from the record what grounds of demurrer were alleged in any of them.

Also on September 6th the court entered the following order on its chancery side:

"This day came the Fireproof Wood Products Corporation, B. & C. Sales Corporation, Pulaski Veneer Corporation, T. C. Coleman, and moved the court to dissolve the injunction heretofore awarded on the 11th day of July, 1929, because awarded without notice, because no date of expiration was fixed in the injunction order, because no bond was required, and because the allegations of the bill and petition were not sufficient to justify the granting of an injunction, also came the plaintiffs and moved the court to enlarge and continue said injunction to the first day of the November term, 1929, of this court.

"The court takes time to consider and this cause is made a vacation cause, and the said injunction is continued in force for a period of thirty days from this date upon the giving of a bond by the plaintiffs, or some one for them, before the clerk of this court, with approved security, conditioned according to law in the penalty of $5,000."

By subsequent orders entered from time to time, in all which an injunction bond was required, the injunction was continued in effect until "the May (1930) term of this court, and until such day during said term as these causes may be heard and determined." There is no order continuing the injunction beyond the time mentioned in the last sentence.

On October 1, 1929, H. C. Gilmer, receiver of Fireproof Wood Products Corporation, filed before the judge in vacation what is denominated therein as an "amended and supplemental bill." But like the injunction bill, this supplemental and amended bill contains no allegations what-

ever that the complainant has any cause of action against Boger. This pleading recites the bill for an injunction filed on July 11th, by the complainant and the others whose names are thereunto signed, the order of July 11th granting an injunction, and the order of September 6th continuing it in effect for thirty days from that date. After setting forth much that has no bearing on the questions here in issue, the bill makes the following allegations:

"Pulaski Veneer Corporation [has] violated the injunction order of July 11, 1929, by paying money to A. E. Boger in direct violation of that order and since September 6, 1929, has also violated the spirit of said injunction order as continued under the pretense that this course was necessary in order to promote the business of Pulaski Veneer Corporation.

"T. C. Coleman is president of Pulaski Veneer Corporation. He and said Boger formed the corporation referred to in the original bill as the B. & C. Sales Company, Inc., for the purpose of placing a part of the commissions payable to the Veneer Corporation to A. E. Boger, on orders given to the Veneer Corporation by Victor Talking Machine Company and its subsidiaries, beyond the reach of the creditors of A. E. Boger, who, at that time, to the said A. E. Boger's knowledge and by communications directly given to him [were seeking] to hold him personally liable for certain indebtedness of Fireproof Wood Products Corporation; and for the further purpose of enabling T. C. Coleman, president of said Veneer Corporation, to put a portion of these commissions paid by his own corporation, in order to secure its own business, into his own pockets. * * *

"Pulaski Veneer Corporation, C. E. Richardson, its secretary and treasurer, and T. C. Coleman, its president, have conspired and are conspiring to defeat the creditors of Fireproof Wood Products Corporation in the collection of their claims asserted in the original bill in this suit, and in the attachment suits hereinabove referred to."

The prayer of the amended and supplemental bill is that Pulaski Veneer Corporation, B. C. Sales Company, Inc., C. E. Richardson, T. C. Coleman and A. E. Boger be made parties defendant and required to answer it, but not under oath; that the injunction theretofore granted be extended; * * * that T. C. Coleman, who is resident director and officer of said B. & C. Sales Company, Inc., be required to file forthwith in court a certified copy of the charter of B. & C. Sales Company, Inc., also the organization minutes and minutes of all subsequent transactions of said B. & C. Sales Company, Inc., and disclose what amount is due it from Pulaski Veneer Corporation or any other corporation or person, and accrued from July 13, 1929, forward; what stock in B. & C. Sales Corporation is owned by A. E. Boger and what dividend he is entitled to thereon; * * * also what stock is owned by A. E. Boger in Pulaski Veneer Corporation. * * *

Neither H. C. Gilmer, receiver of Cheves Lumber Company, nor Pulaski National Bank, nor any of the parties (other than H. C. Gilmer, receiver of Fireproof Wood Products Corporation) who signed the petition, or bill, filed July 11, 1929, are parties complainant in this "amended and supplemental bill," nor are they made parties defendant to it. On October 5th, the court entered an order continuing the injunction in effect as prayed in this petition, but entered no further decree thereon.

On October 1st, the same day that H. C. Gilmer, as receiver for Fireproof Wood Products Corporation, filed his "amended and supplemental petition" on the chancery side of the court, he filed on the law side of the court his petition for an attachment against A. E. Boger as sole principal defendant. This petition alleges that Boger is indebted to the Fireproof Corporation in the sum of $2,900 "for the destruction and misappropriation and loss of the assets" of that corporation, and that he (Gilmer) as its receiver is entitled to recover from Boger at least that amount. It names Pulaski Veneer Corporation, B. C. Sales Co., Inc., and T. C. Coleman as codefen-

dants, and makes practically the same allegations with respect to Boger's commission contract with Pulaski Veneer Corporation, the formation of the B. & C. Sales Corporation by Boger and Coleman, and the assignment by Boger to it of the commission contract for the purpose of defeating the collection of the claims of his creditors that are contained in his "amended and supplemental bill." The petition prays for a judgment and an attachment against Boger "and that said attachment be levied on the stock in said B. & C. Sales Corporation owned by A. E. Boger or authorized to be issued to him, and that the codefendants be required to answer and give practically the same information which he asked in his amended and supplemental bill that they be required to give.

The attachment prayed for was issued returnable to the first day of the November term; and copies of it were served on T. C. Coleman and "B. &. C. Sales Co., Inc." on November 2, 1929, and on Pulaski Veneer Corporation on November 4, 1929.

So far as the record discloses there was no service on this attachment on Boger either in person or by order of publication, nor was an answer ever filed by him to it: but his subsequent general appearance in this consolidated cause is a general appearance in this attachment proceeding.

On October 10, 1929, Pulaski National Bank and D. A. Smith, receiver of Rocky Gap Flooring Company, each filed a petition for attachment against Boger as sole principal defendant; and W. F. White filed an amended and supplemental petition for attachment against him as sole principal defendant. The amounts for which a judgment and attachment are asked in these several petitions are as follows: By Pulaski National Bank, $2,746.48; by D. A. Smith, receiver, $2,450; by W. F. White, $1,955.79.

White's petition is amendatory and supplemental to his petition filed September 6th. While Smith's petition makes no reference to the petition which he had filed on July 3rd and subsequently dismissed it shows that the $2,-

450 sued for in it is a part of the same demand sued for in the petition filed by him on July 3.

Each of these three petitions charge that the petitioner is entitled to recover from Boger the amount sued for as damages suffered by him as the result of his having been induced by Boger by false and fraudulent representations to grant credit to that amount to the Fireproof Corporation. Each of them names Pulaski Veneer Corporation, B. & C. Sales Co., Inc, and T. C. Coleman as codefendants and persons who are indebted to Boger, and makes practically the same allegations with reference to them as are made in the "amended and supplemental bill" filed by H. C. Gilmer, receiver, on October 1st. Except as to the amount sued for, they contain practically the same prayers as are contained in the petition for attachment filed by H. C. Gilmer, receiver, on October 1.

The allegations as to the false and fraudulent representations in all three petitions are copied word for word from the allegations hereinbefore quoted from the petition for attachment of W. F. White filed September 6, 1929.

An attachment issued on each of these petitions, returnable to the first day of the November term; and copies thereof were served on Boger and Pulaski Veneer Corporation on October 12th, and on T. C. Coleman and "B. & C. Sales Company, Inc.," on October 14th.

On October 30, 1929, Boger filed demurrers and answers to the bill filed July 3rd, the injunction bill filed July 11th, and the amended and supplemental bill filed October 5th. At the same time Pulaski Veneer Corporation, T. C. Coleman, B. C. Sales Company, Inc., and C. E. Richardson filed their separate demurrers and answers to the amended and supplemental bill filed October 5th.

All the demurrers except Boger's are general demurrers and state no specific grounds of demurrer.

For demurrers to the bill filed July 3, 1929, Boger "adopts the demurrer heretofore filed by the Fireproof Wood Products Corporation and the grounds thereof";

but no demurrer to the bill of July 3rd by that corporation is in either the printed record or the origial record certified up to this court by the clerk of the trial court.

For demurrer to the bill filed July 11, 1929, Boger adopts "the demurrer and grounds of demurrer theretofore previously filed" (which, as has been said, are not found in the record) and "for additional grounds of demurrer, says that the allegations of the bill or petition do not justify the issuance of an injunction because the remedy at law by attachment is adequate."

So far as it need be here noticed Boger says for demurrer to the amended and supplemental bill filed October 5th, that "it is insufficient in law to entitle the complainant to the relief prayed for or to any relief," because "the attempted charge of conspiracy is not such as to entitle the complainant to any relief," and "the facts set out show that the complainant has an adequate remedy at law which has already been pursued."

In his answer to the bill filed July 3rd, Boger denies "that he made any representations to H. C. Gilmer, receiver (of Cheves Lumber Co.), or any other parties to this suit for which he is personally liable," and that he is liable to H. C. Gilmer, receiver of Cheves Lumber Co., or to the Fireproof Corporation, or to any of its creditors in any sum on account of anything in the bill mentioned.

In his answer to the bill filed July 11th, Boger asserts that the attachments mentioned in the petition were "void" as to him, and denies that the plaintiffs are entitled to any injunctive relief. He inferentially admits that Pulaski Veneer Corporation has made payments to B. & C. Sales Co., Inc., since these attachments were issued; but he avers that these payments were not in violation of the attachments, and that, even if they were, this was not a ground for injunctive relief, because Pulaski Veneer Corporation is solvent and able to pay any judgment that might be recovered against it under these attachments. With reference to the B. & C. Sales Co., Inc., he denies that it "is a nominal corporation or that it was

formed for any other than legal business" and that it has been used "to conceal any of his property or place it beyond the reach of his creditors." He further denies "the right of petitioners to any bill of discovery against the stockholders" of it, and asks leave of the court "to reserve my answer in regard to" it until it has been established by proof that the complainants or some of them have a valid claim against him.

In his answer to the "amended and supplemental bill" filed October 1st, Boger denies all the allegations of fraud and misrepresentations made against him in that and the bills which had preceded it; that "he and T. C. Coleman formed the B. & C. Sales Corporation for any purpose other than that of conducting a lawful and proper business in a lawful and proper manner, and * * * that there was any intention or purpose on their part of attempting to put any property of this defendant beyond the reach of any of his creditors; and that Pulaski Veneer Corporation, C. E. Richardson, * * * and T. C. Coleman have conspired with him to defeat the creditors of the Fireproof Wood Products Corporation in the collection of any of their claims." But he makes no answer, either in this answer or in the answer filed by him to the injunction bill filed July 11th, as to what his interest is in the commissions accrued or to accrue under his contracts with Pulaski Veneer Corporation, or as to his assignment of that contract to B. & C. Sales Co., Inc., or as to his interest in that corporation. He merely "asks leave of the court to reserve any answers in regard to the B. & C. Sales Corporation until after * * * proof of a liquidated and valid claim against" him. The answer makes no reference to the averment of the "amended and supplemental" bill that Pulaski Veneer Corporation has violated the injunction by paying money to him, but it contains a general denial of all the allegations thereof which are not confessed.

The Pulaski Veneer Corporation in its answer avers that it is indebted to B. & C. Sales Corporation "on account

of a certain commission contract with it for the sale of manufactured products to the Victor Talking Machine Company;" but it denies that it is "indebted in any way to A. E. Boger, and that it has conspired with him or any other person to defeat the creditors of Fireproof Wood Products Corporation in the collection of their debts."

The answer of Coleman is to the following effect: He admits that he is president of the Pulaski Veneer Corporation and is one of the incorporators and stockholders of the B. & C. Sales Corporation. But he alleges that "B. & C. Sales Corporation was formed in the regular course of business for entirely legitimate purposes and before there was any litigation against A. E. Boger, and * * * was organized pursuant to an agreement made prior to any contract between Pulaski Veneer Corporation and the Victor Talking Machine Company." He denies that the purpose of forming this corporation was to place a part of the commissions payable by Pulaski Veneer Corporation to A. E. Boger, beyond the reach of the creditors of A. E. Boger, or to enable him (Coleman) to receive a part of the commissions to which he was not justly entitled; and that he has conspired or is conspiring with Boger to defeat the creditors of the Fireproof Corporation in the collection of their claims. He further denies the right of the complainants to require a discovery of matters pertaining to the business, and stock ownership of B. & C. Sales Corporation until it has been established by proof that Boger is indebted to them, or some one of them.

The answer of "B. & C. Sales Corporation, Inc.," denies that it was "organized for the purpose of placing a part of the commissions payable to A. E. Boger by the Pulaski Veneer Corporation beyond the reach of A. E. Boger's creditors, or of enabling T. C. Coleman, president of the Veneer Corporation, to receive improperly any part of said commissions;" and that it has conspired with Coleman or any other person to defeat the creditors of Fire-

proof Wood Products Corporation in the collection of any of their claims. It then avers that it (B. & C. Sales Corporation) "is entitled to large sums of money on account of commissions on sales made for the Veneer Corporation;" and charges that "even if A. E. Boger is indebted to any of the parties to this litigation and if by reason thereof, there is a lien upon any part of this respondent's property, * * * it is unreasonable to restrain and prevent this respondent from receiving any part of its justly earned income, or from distributing the same among any of its stockholders, other than A. E. Boger." This answer is sworn to by A. E. Boger.

The contents of Richardson's answer need not be here noticed, other than to say that it denies any conspiracy on his part to prevent the creditors of Boger from collecting their claims against him.

On November 11th, H. C. Gilmer, receiver of Fireproof Wood Products Corporation, reported to the court a sale of the real estate and plant of that corporation for $30,-000, which sale the court by its order of that day confirmed.

On November 15th the court entered on its law side an order which recites that Boger filed his demurrer to the original and supplemental petitions of W. F. White for an attachment, which the court overruled, and "for plea says that he does not owe the debt in the plaintiff's attachment sued for. However, this demurrer is not in the record, and the order does not show the grounds thereof. On November 16th an order was entered in this proceeding, with the consent of the parties, transferring it to the chancery side of the court.

On November 16th Boger filed his separate answers to the original and amended petitions for attachment against him filed by W. F. White, and to the petitions for attachment filed against him by D. A. Smith and Pulaski National Bank on October 10th, all which answers are sworn to by him. But so far as the record certified up to us discloses, he filed no demurrer to the petitions of D.

A. Smith and Pulaski National Bank, nor did he file either a demurrer or an answer to the petition for attachment filed against him by H. C. Gilmer, receiver of Fireproof Wood Products Corporation.

In these answers Boger denies that he has made any of the false and fraudulent representations alleged in these petitions, and that he is liable to any of them for any sum. He admits that he is a nonresident, and says that, "your respondent is a stockholder of B. & C. Sales Corporation and the Pulaski Veneer Corporation is indebted to the B. & C. Sales Corporation in a substantial amount, and the B. & C. Sales Corporation is indebted to your respondent." But he denies that the Pulaski Veneer Corporation is indebted to him in any sum.

On November 16, 1929, the court "by agreement of all parties before the court in these several attachments," entered its order transferring the attachment proceedings heretofore mentioned (except the petitions for attachment filed by W. F. White and by D. A. Smith against the Fireproof Corporation and A. E. Boger as principal defendants filed July 3, 1929) to the chancery side of the court, and consolidating them with the "chancery cause of H. C. Gilmer, receiver of Fireproof Wood Products Company, and others against A. E. Boger and others, brought as a creditors bill, and the supplemental pleadings thereon."

This decree also recites that "the plaintiff asked leave to amend his several petitions by inserting therein the allegation that A. E. Boger represented that he and his associates had already put $25,000 into this company" (Fireproof Wood Products Corporation), "which amendment the court allowed to be made." In pursuance of this permission the bill filed July 3rd and the petitions for attachment filed by W. F. White, Pulaski National Bank and D. A. Smith were amended by the insertion therein of the allegation mentioned.

The court had not theretofore passed upon any of the demurrers other than that of Boger to the petitions for attachment filed by W. F. White, and does not at this

time expressly pass upon them. But after permitting the amendment in the decree mentioned, the court proceeds to prescribe the terms within which the several parties shall complete the taking of their depositions, and by a later decree it referred the cause to a commissioner to take an account therein, and by these decrees it impliedly overruled the demurrers to all the pleadings as they read after the amendments had been made in accordance with the permission of the court.

On February 17, 1930, the court entered the following order in the consolidated cause:

"It is now ordered on motion of the complainants that the said injunction be and it is hereby continued in effect until the May term of this court, and *until such day during said term* as these causes may be heard and determined." (Italics ours.)

This was the last order entered continuing the preliminary injunction which had been granted, and upon the adjournment of the May term, 1930, the injunction expired by its own limitation; but the record does not show when the May term of the court ended. This order also denied the motion of the complainants to require the Pulaski Veneer Corporation to pay into court the amount of money "in its hands due and owing, according to its disclosures to B. & C. Sales Company, Inc., and to pay into court all subsequent amounts accruing." While the recitals of this order indicate that the Pulaski Veneer Corporation had answered and disclosed the amount in its hands due to B. & C. Sales Co., Inc., no such answer is in the record.

On March 21 and 22, 1930, the plaintiffs in the several proceedings took and completed taking their depositions in chief, which consist of the depositions of a number of witnesses, and cover 187 printed pages. So far as these relate to Boger's personal liability to the several plaintiffs, we need not notice them further than to say that in our opinion they were insufficient to establish any personal liability on his part to either the Fireproof Wood

Products Corporation or to any of its creditors who is a party to these proceedings.

But during the taking of these depositions the plaintiffs called Boger to the witness stand and examined him as an adverse witness, in accordance with the provisions of section 6214, Code Va. 1919; and it is pertinent to state here his testimony with reference to the contracts between himself and the Pulaski Veneer Corporation and with reference to whom the commissions accrued under those contracts belong. Given, as far as it is practical to do so, in his own words, it is as follows:

In January, 1928, Mr. T. C. Coleman and I decided to organize a company called the Best Cabinet Company. We were going to put an office in New York and manufacture and have manufactured radio cabinets. "Our business was to sell cabinets to radio manufacturers and use the connections and entrees I have had with the large radio corporations, and he was going to use his connections he had in his plants and with other plants upon the manufacture of radio cabinets. The question of panels was never thought of, and never entered into. We had sample cabinets built up and sent to F. A. Andrews Co.," a number of other companies, and to the Victor Talking Machine Company, and stock cabinets to be sold to small manufacturers. Upon the shipment of the cabinets to Victor, Mr. W. A. Weiland, vice-president and works manager of Audio-Vision Appliance Company (then known as Victor Talking Machine Company) "the question was asked me—could we furnish them panels and veneers for the time being instead of cabinets, and I said we could furnish some, as the veneer plant here [i. e., in Pulaski] was a very small concern, and the panel plant was much smaller; * * * but if business would justify it we could get together and enlarge the size of the plant. Negotiations went on, and Mr. Weiland and Mr. E. T. Keifer, general superintendent, and I came to Pulaski, Virginia, to look over the panel situation, and the possibility of

Pulaski Veneer Corporation furnishing panels to them for the coming year."

"We went back to Philadelphia, and Mr. Keifer and Mr. Weiland and I had several conferences, and the question came up that I would see if we could increase the size of the plant. I got Mr. C. E. Richardson, manager of Pulaski Veneer Corporation and Virginia Panel Company on the 'phone and he and Mr. T. C. Coleman, president of Pulaski Veneer Corporation and also president of Coleman Furniture Company came to Philadelphia. * * * We went into conference [that night] and next day, March 5th, with the officials of the Victor Talking Machine Company; and we took an order for" 100,000 R. E. 45 doors complete and over 1,000,000 feet of taped up stock. "Then I said to Richardson at that time that *we* would have to have five per cent commission. Mr. Richardson said he was paying five and ten per cent on his veneer then, and it was a satisfactory connection. * * * (Italics ours.)

"At that time the business did not look like it would be sufficiently large enough for commissions to really amount to much, as expense of travel and expense of getting business of this volume will run in the neighborhood of $3,000 a month. We continued along the line of the Best Cabinet Company, and then changed it to B. C. Sales, to handle Best Cabinets, our trade-mark."

Just at this point he was asked, "When was that change made?" Replying, he continued his testimony:

"I should say, we put our sole attention to panels two weeks later, for the simple reason that Mr. Weiland and Mr. Keifer said that if Pulaski Veneer Corporation and Virginia Panel Company was to get their business I would have to give my sole time and attention to the business, and would have to be responsible to them for delivery of goods, and also the manufacture. So then the question came up of the Pulaski Veneer Corporation paying the B. C. Sales Company, which at that time you might call a co-partnership, because there was not a corporation, for the five per cent commission. Then the corpora-

tion was formed as agreed upon in January, and the contract was changed to B. C. Sales Company, Inc. I first had a letter from Pulaski Veneer Corporation giving me or my assigns an unconditional five per cent on all business. Then a contract was drawn. * * *

"A new contract was drawn with Pulaski Veneer Corporation and myself which there was some question over, but it carried on just the same, and the checks changed from A. E. Boger to B. C. Sales Company and the disbursements made by B. C. Sales Company instead of A. E. Boger, special account, for we called it the B. C. Sales Company just the same. It was always known as B. C. Sales Company after March 9th or 10th, whenever it was we decided to call it the B. C. Sales Company. That is the history of B. C. Sales Company."

The new contract to which Boger referred was introduced in evidence. It is dated June 20, 1929, and the only parties to it are Pulaski Veneer Corporation, party of the first part, and A. E. Boger, party of the second part. The material parts thereof read:

"The party of the first part has this day employed the party of the second part to sell its products * * * to the Victor Talking Machine Company * * * or to the Audio-Vision Appliance Company [its] successor * * * on orders to be approved by the party of the first part; said party of the second part to receive a commission of five per cent on said orders so approved. * * *

"This contract is only to apply to sales made by the party of the second part, * * * to the said Victor Talking Machine Company, or to its successor. * * *

"It is further understood and agreed that this contract supersedes all former contracts made by said A. E. Boger with the party of the first part, or with the Virginia Panel Corporation, and that the sole consideration of this contract is based upon the personal efforts of said A. E. Boger in securing said orders from the Victor Talking Machine Company and the Audio-Vision Appliance Company, and in event that for any reason said A. E. Boger should not

personally continue to secure orders from said Victor Talking Machine Company, or the Audio-Vision Appliance Company, and use his influence and personal efforts in the fulfillment of said orders as done heretofore by him, that the party of the first part may at its option cancel this contract by giving thirty days written notice of its intention so to do.

"It is further understood that this contract is to take the place of all previous contracts made between said A. E. Boger, and the party of the first part, and the Virginia Panel Corporation, and also covers any unfilled orders made between either the Virginia Panel Corporation or the Pulaski Veneer Corporation."

The contract is signed by "A. E. Boger" and by "Pulaski Veneer Corporation by T. C. Coleman, president," and the corporation's seal is affixed and attested by "C. E. Richardson, secretary."

At the bottom of this contract is written this assignment:

"For value received, I hereby assign this contract, and all commissions arising thereunder, to the B. C. Sales Co., Inc., a corporation duly incorporated under the laws of the State of Delaware, with its principal office at Wilmington, Delaware, and hereby agree to comply with and carry out the provisions of said contract personally as to securing orders and assisting in their fulfillment.

"Given under my hand and seal this 20th day of June, 1929.

"A. E. Boger (Seal)."

Boger testified that the others who appeared as stockholders and officers in the B. C. Sales Co., Inc., were figureheads, and that he and T. C. Coleman were the only persons who were beneficially interested in it. With reference to their respective interests in it his testimony was as follows:

"Q. Mr. Boger, returning to the ownership of the corporation, have you and T. C. Coleman ever agreed upon

the proportion of stock each of you should have or own in the corporation and how you should share—in what proportion—the profits?

"A. This is the answer to that question. We started B. C. Sales Company to handle what we called Best Cabinets. After the expenses were paid, we were to divide the profits fifty per cent, after the expenses were taken out. We have not sold any cabinets, and we will have to revamp our plans in regard to that and adjust them in an equitable way in case I make a connection with some other people that I am contemplating now on the outside. * * *

"Q. I am trying to get at what proportion, if any, you are entitled to of the money which has already been disclosed in this case is due B. C. Sales Co., Inc., from Pulaski Veneer Company, and which is involved in these attachments.

"A. About half of it. * * * The books will show the disbursements, they are put in the ledger, and the expenses, and it may be $1,000 in my favor or $2,000 or maybe that much in Coleman's favor. Those are the questions that would not make much difference one way or the other.

"Q. I would like to ask you whether or not you are entitled to fifty per cent of the net profits of B. & C. or not. I want that definite.

"A. I will answer that definite.

"Q. Who is entitled to the remainder?

"A. I should say Mr. Coleman."

When the taking of the plaintiff's depositions in chief had been completed, and while the cause was awaiting the taking of depositions by A. E. Boger and the other defendants, certain things happened which materially changed the course of this litigation, and no further depositions were taken until depositions were taken before W. B. Kegley, special commissioner, more than a year later.

To return now to the course of the proceedings. On May 9, 1930, the court entered the following order:

"This day came the B. & C. Sales Company, Inc., and moved the court to require the Pulaski Veneer Corporation to pay into court the amount due by the Veneer Corporation to the Sales Company, and now impounded by the orders and decrees of the court. W. B. Kegley, attorney for Veneer Corporation being absent, upon request of the Veneer Corporation, the further hearing of this matter is continued until May 12, 1930."

It appears that the motion mentioned in the above decree was made in accordance with instructions written or wired by Boger to his counsel. At that time Boger's counsel were the same attorneys who were representing Coleman, B. C. Sales Co., Inc., and Pulaski Veneer Corporation; but shortly after this time he employed other counsel to represent him.

On May 11, 1930, Pulaski Veneer Corporation had advised Boger orally that it terminated its commission contract with him; and on May 13th it wrote him a letter saying: "This is an official notice of the severance of your connection with the Pulaski Veneer Corporation in all capacities."

On May 12th Boger called Mr. H. C. Gilmer over the telephone and asked him to come to Washington for a conference with him about this litigation, and he agreed to meet Boger on the 14th in Washington. On the 14th Mr. Gilmer and Mr. E. W. Calfee (a director in the Pulaski National Bank) met Boger in Washington. On that day, as a result of that conference, a power of attorney and collateral assignment were drawn up and signed by Boger. The power of attorney was later acknowledged by Boger in Philadelphia on May 19, 1930. These papers read:

### Power of Attorney.

"Washington, D. C., May 14, 1930.

"I, A. E. Boger, hereby authorize and empower J. L. Wysor, of Pulaski, Virginia, as my attorney in fact to confess judgment against me in the clerk's office of the Circuit Court of Pulaski county, Virginia, in vacation of

said court, or in term of said court, on any day or during any term thereof hereafter, in favor of the following persons who are attachment plaintiffs and complainants in chancery proceedings, now pending against me in said court and complainants in said proceeding and in the consolidated causes as shown by the decree of consolidation entered by said court on the —— day of November, 1929, in the respective amounts set opposite their names, as follows:

"Pulaski National Bank..........................$2,746.48
H. C. Gilmer, Receiver of Fireproof Wood Products Corporation ................................. 2,900.00
D. A. Smith, Receiver of Rocky Gap Flooring Company ........................................ 2,450.00
James McGraw, Inc. ............................ 118.74
W. F. White, trading as W. F. White Lumber Co... 1,955.79
F. L. Quesenberry ............................. 599.14
H. C. Gilmer, Receiver Cheves Lumber Company... 3,500.00
Pulaski Engineering Works ..................... 221.66
Midland Valley Lumber Co. ..................... 278.92
Virginia Hardwood Lumber Co. .................. 300.42
Standard Oil Co. of New Jersey ................ 48.34

"With interest on each of the amounts aforesaid from January 1, 1929, and costs; and forthwith to have executions issued on said judgments and levied.

"And I, the said A. E. Boger, hereby authorize and empower my said attorney in fact to enter all appearances, sign, seal and deliver all papers and documents, have all decrees and orders of court entered, and perform all acts necessary to carry out fully the purposes of this appointment, as fully and effectually to all intents and purposes as I could do, perform and execute the same, if acting in proper person.

"The effect of this appointment and of this paper is to be governed by the laws of the State of Virginia.

"Witness my hand and seal this 14th day of May, 1930.

"(Signed) A. E. Boger (Seal).

"Witness:
E. W. Calfee,
H. C. Gilmer."

## Collateral Agreement.

"The undersigned, A. E. Boger, of Pulaski, Virginia, hereby assigns to J. L. Wysor, of Pulaski, Virginia, for value received, and upon the terms and conditions here- inafter set out, all his stock and interest in B. C. Sales Co., Inc., in which is included the stock on said B. C. Sales Company standing in the name of T. R. Boger, Jr., and all the rights, dividends, compensation and benefits grow- ing out of all contracts and agreements made between me and Pulaski Veneer Corporation, of Pulaski, Virginia, and especially the contract made between me and said Pulaski Veneer Corporation, dated June 20, 1929, and by me as- signed on the same day to said B. C. Sales Company, Inc., relating to commissions on business and sales to be pro- duced and made for said Veneer Corporation, with the understanding that out of any moneys collected for me or for B. C. Sales Company, Inc., on account of said com- mission contract, and/or on any other account, or in any way growing out of this assignment, the assignee, the said J. L. Wysor shall pay one-half of such collections in full discharge of the judgments to be confessed by me through J. L. Wysor, my attorney in fact, under power of attorney executed by me on this day, and the other half thereof at the same time to me, provided the amount to be paid in full discharge of said judgments shall not ex- ceed $7,000 in any event, the remainder to be paid to me, though over the fifty per cent. It being understood that in event my assignee shall have to conduct litigation of any kind in order to enforce the rights hereby assigned the expenses thereof including reasonable attorney's fees shall be deducted before a division.

"And there is hereby assigned to my said assignee, for me and on behalf of B. C. Sales Company, Inc., all its rights, interests and claims against said Pulaski Veneer Corporation, subject to the provisions aforesaid as to dis- bursements of proceeds of collection, with right to my assignee to sue for settlment in his own name or to con-

duct such litigation as he may deem best in the name and on behalf of said B. C. Sales Company, Inc., and to enforce all the rights of said B. C. Sales Company, Inc., and to secure settlements among all its stockholders.

"T. R. Boger, Jr., also signs this assignment and agreement in order to assign all his interest in said B. C. Sales Company, Inc., and to evidence his assent to all the terms hereof.

"Witness the following signatures this the 14th day of May, 1930.

"A. E. BOGER,

B. C. SALES COMPANY, INC.,

By A. E. BOGER,
*President.*

"T. R. BOGER, JR.,

By T. R. BOGER, JR.,
*Secretary-Treasurer.*"

On May 20, 1930, J. L. Wysor appeared in the clerk's office of the Circuit Court of Pulaski county and as attorney in fact for Boger confessed judgment against him in favor of each of the parties in whose favor he was empowered to confess judgment by the power of attorney.

The judgment confessed in favor of W. F. White is for the principal sum of $1,595.75 with interest from January 1, 1929. The judgments confessed in favor of each of the others is for the amount set opposite his or its name in the power of attorney with interest from January 1, 1929. The record does not disclose why the judgment in favor of W. F. White was confessed for $1,595.75 instead of $1,955.79.

The confession of judgment signed by J. L. Wysor as attorney in fact for Boger is in all cases (except for the name of the person in whose favor it is confessed and the amount) the same as the confession of judgment in favor of Pulaski National Bank, which reads:

"Virginia:

"In the clerk's office of the Circunt Court of the county of Pulaski.

"I, A. E. Boger, hereby acknowledge myself to be justly indebted to, and do hereby confess judgment in favor of, Pulaski National Bank in the sum of twenty-seven hundred and forty-six dollars and forty-eight cents ($2,746.48) with interest thereon from the 1st day of January, 1929, until paid, and the costs of this proceeding.

"Given under my hand and seal this 20th day of May, 1930.

> "A. E. BOGER (Seal)
>
> By J. L. WYSOR,
> *His attorney in fact.*

"Virginia:

"In the clerk's office of the Circuit Court of the county of Pulaski:

"The foregoing judgment was duly confessed before me in my said office on the 20th day of May, 1930, at 4 o'clock P. M. and has been duly entered of record in Common Law Order Book No. 10, page 407.

> "Teste:
>
> "J. N. BOSANG,
> *Clerk.*

There is nothing in any of them to show in what suit or proceeding or upon what account the judgment was confessed; but the entries of the judgments upon the order book of the court by the clerk bear the following captions:

"H. C. Gilmer, receiver of Cheves Lumber Co., plaintiff
 *v.* In chancery
A. E. Boger, defendant."

"Pulaski National Bank, plaintiff
 *v.* Upon an attachment
A. E. Boger, defendant."

"Pulaski Engineering Works, plaintiff ·
 *v.* In assumpsit
A. E. Boger, defendant."

The captions of each of the judgments in favor of H. C. Gilmer, receiver of Fireproof Wood Products Corporation, D. A. Smith, receiver of Rocky Gap Flooring Co., and W. F. White is (with the exception of the name of the plaintiff) in all respects the same as that of the judgment in favor of Pulaski National Bank, and shows that the judgment is a judgment "upon an attachment."

The caption of each of the judgments in favor of F. L. Quesenberry, Virginia Hardwood Lumber Co., Standard Oil Co., Midland Valley Lumber Co., and James McGraw, Inc., is (with the exception of the name of the plaintiff) in all respects the same as that of the judgment in favor of Pulaski Engineering Works, and shows that it is a judgment "in assumpsit."

There is nothing in the text of any of the judgments as entered by the clerk to show in what suit or proceeding or upon what account the judgment was confessed. But it was stipulated before the commissioner to whom the cause was later referred "that pursuant to the authority conferred upon J. L. Wysor by the power of attorney of May 14, 1930, * * * he did, with the consent and approval of the plaintiffs, confess said judgments and that said judgments were all confessed subject to and pursuant to the contract of May 14, 1930, * * * the terms of which were accepted by the plaintiffs in said judgments, above set out," *i. e.,* the judgments which we have mentioned above.

So far as the record discloses no execution issued on any of these judgments.

No further proceedings were had or orders entered

which affect the rights of the parties or the questions here at issue until February, 1931. But it appears from a recital in the decree of October 1, 1931, that on or about December 11, 1930, "under an agreement between B. C. Sales Company and Pulaski Veneer Corporation dated the 11th day of December, 1930," $17,791.78 was deposited in the Pulaski National Bank "as the depository designated by both parties to said agreement."

The agreement referred to in this order is not in the record, nor does the record disclose its terms; but it does later appear that the $17,791.78 was the total amount which Pulaski Veneer Corporation admitted that it owed B. C. Sales Co., Inc., for commissions as of December 11, 1930. However, the court in the decree of October 1, 1931, treats this deposit as being under the control of the court and orders "that said money be retained by the clerk of this court on deposit in Pulaski National Bank * * * pursuant to the terms and conditions of said agreement of December 11, 1930; and that said bank hereafter, until the distribution of said money," pay interest on the deposit at two per cent per annum.

At the February term, 1931, the court entered a decree referring the consolidated cause to W. B. Kegley, as a special commissioner of the court, and directed him "to take, state and return to the next term of the court a report and account showing:

"1. The amount of money now on deposit in Pulaski National Bank, representing the amount which Pulaski Veneer Corporation claimed to owe at the time of said deposit to B. C. Sales Company, Inc.

"2. The portion of said money to be distributed to the attaching creditors; to A. E. Boger and T. C. Coleman, and the respective rights of the last named, respectively, in such distribution, exclusive of the attorneys' fees involved in the attachment suit of H. C. Gilmer.

"3. The amount of money paid to A. E. Boger since July 11, 1929, on account of commissions growing out of the written contract between said Boger and Pulaski Ve-

neer Corporation, filed as an exhibit in these causes and which contract was assigned by said Boger to B. C. Sales Company, Inc.

"4. The actual stock interests, respectively, of A. E. Boger and T. C. Coleman, and also of T. E. Boger, Jr., if any, in B. C. Sales Company, Inc.

"5. The amounts of the several attachments consolidated in these causes, and the several amounts of judgments confessed thereon by A. E. Boger.

"6. Any other matter deemed pertinent by the commissioner to be reported or requested in writing by him to be reported by any party in interest."

On June 22, 1931, Commissioner Kegley began the taking of the accounts and making of the inquiries ordered by the above mentioned decree. At this time certain documentary evidence was introduced, but H. C. Gilmer (the receiver for both the Cheves Lumber Company and the Fireproof Corporation and counsel for all the others who are here asserting claims against Boger) objected to proceeding further until Coleman had filed the answer and cross-bill which he had indicated it was his purpose to file. Thereupon the further taking of the account was adjourned until August 10, 1931.

On June 23 or 24, 1931, T. C. Coleman filed an amended answer to the amended and supplemental bill filed by H. C. Gilmer, receiver, and prays that it may be treated as a cross-bill.

In this pleading Coleman makes the following allegations:

He and Boger are and have been at all times the sole beneficial owners of B. C. Sales Co., Inc., and through it are interested equally in the commissions which have accrued under Boger's contract with the Pulaski Veneer Corporation, which he assigned to the B. C. Sales Co., Inc. He (Coleman) was and is financially interested also in the Pulaski Veneer Corporation. After the injunction order of July 5, 1929, and the attachments here involved or some of them had been issued, Boger repre-

sented to him that he could not continue the work of procuring orders for the Pulaski Veneer Corporation, unless he was paid some of the money arising from the commissions accruing to the B. C. Sales Co., Inc., to meet the expenses of the business. Boger and his counsel also assured him that Boger had a substantial defense to all the claims asserted against him in these several proceedings. Relying upon these statements and knowing that Boger had filed answers under oath denying his liability on all these claims, he (Coleman) "advised the Pulaski Veneer Corporation to advance moneys to said Boger" from the commissions due by it to B. C. Sales Co., Inc. The result is that, though he (Coleman) has received none of the money arising from these commissions, Boger withdrew or received "practically all" his part of those commissions while he was actively defending the claims asserted by the plaintiffs in these causes, and before he executed the power of attorney and the assignment to J. L. Wysor and made the confessions of judgment which have been heretofore mentioned. By reason of these facts all the money which the Pulaski Veneer Corporation had in its hands when these judgments were confessed, and all "the funds now on deposit" with the clerk of the court, belong through the medium of B. C. Sales Co., Inc., to him (Coleman) and no part thereof to Boger.

Coleman further alleges that about May 11, 1930, the Pulaski Veneer Corporation found it necessary to dispense with Boger's services because of his conduct, which angered Boger, and he thereupon set out to injure him (Coleman) and the Pulaski Veneer Corporation as much as possible. He then charges that "these confessions of judgment [and the collateral assignment to Wysor] were made, not for the purpose of acknowledging any indebtedness to the several plaintiffs thereon, but for the purpose of embarrassing, hindering, delaying and defrauding the respondent, and as an attempt to take from this respondent property of the B. C. Sales Corporation which did not belong to A. E. Boger, and apply the same to the

discharge of liabilities for which said A. E. Boger was not responsible, and * * * as to himself and to the B. C. Sales Company, such conduct on the part of Boger was * * * fraudulent and void," all of which he alleges was known to the several plaintiffs through their counsel.

The prayer of Coleman's answer and cross-bill is that the judgments confessed by Boger be held to be void and of no effect in so far as they affect his (Coleman's) interest and that of B. C. Sales Co., Inc., and Pulaski Veneer Corporation.

His contention before the commissioner was that Boger was not liable to any of the complainants in the proceedings composing the consolidated cause; that in so far as he, B. C. Sales Co., Inc., and Pulaski Veneer Corporation may be affected by any liability asserted against Boger in these proceedings, they should be permitted to make all the defenses against Boger's liability which he could make had he not confessed these judgments; and that the judgments confessed by Wysor as attorney in fact for Boger were void for the following reasons:

"(a) The authority to confess said judgments was fraudulently given;

"(b) Said confessions were without consideration;

"(c) The said confessions were without authority of law, in that such confessions are not permissible in attachment proceedings; and

"(d) There was lack of valid power to confess, and * * * the collateral agreement executed at the same time is invalid and inoperative."

Boger filed before the commissioner a demurrer and an answer to Coleman's cross-bill; but as the defenses set up in the demurrer are more fully set up in the answer, we shall not notice it further. These pleadings show a complete reversal by Boger of the position taken by him prior to May, 1930, with reference to the interest of Coleman in the sums paid or payable by the Pulaski Veneer Corporation under its contract with him.

Boger's answer denies all the allegations of Coleman's

cross-bill "unless herein specifically admitted," and stripped of the large volume of purely argumentative matter, makes the following allegations, which we give as far as is practicable, without being too verbose, in his own words:

He (Boger) was a salesman engaged in the selling of wood products, and Coleman was president of the Coleman Furniture Company which was engaged in the manufacture of furniture. They entered into "a partnership arrangement, whereby the said Coleman would cause to be manufactured at his furniture plant various cabinets, and the said Boger as a salesman, would undertake to sell such cabinets and divide the proceeds between said Coleman and Boger on a fifty-fifty basis, * * * At the time of the making of said contracts * * * it was agreed between the two that a corporation should be formed for the purpose of carrying on the business for the manufacture and sale of cabinets and that the said Boger and Coleman would equally divide the proceeds between them. * * *

"T. C. Coleman * * * was also president and director of the Pulaski Veneer Company. The business of the two companies was essentially different. The furniture company manufactured furniture including cabinets, the Pulaski Veneer Company manufactured and sold veneers, and panels. * * *

"While this contract and agreement as to the manufacturing and selling cabinets was in force, * * * Boger determined that he could make a fair return for his efforts by selling these panels for the Pulaski Veneer Company. * * *

"At the time the Pulaski Veneer Company was paying its sales agent from five per cent to ten per cent for making sales of its products. About April, 1930, * * * Boger took up with said secretary and general manager of Pulaski Veneer Company, C. E. Richardson, the question of securing a contract from the Pulaski Veneer Company to sell certain of its products. * * * As a result of the conference, said C. E. Richardson for and on be-

half of the Pulaski Veneer Company entered into a verbal contract with the said A. E. Boger whereby the said Boger was authorized to sell said products of the Pulaski Veneer Company, and the said Veneer Company would pay the said Boger therefor five per cent commission, which contract was confirmed by letter to said Boger written by C. E. Richardson. * * * The said contract between Boger and Coleman related to a different subject matter, and related to another corporation, and * * * said Coleman had no interest in said contract" between Pulaski Veneer Company and Boger.

After he had made this contract with the Veneer Company, "Boger began actively to work to secure customers and orders for the Pulaski Veneer Company products, and took up the matter with the officers of the Victor Talking Machine Company. * * * The officers of the Victor Talking Machine Company on one or more occasions coming to Pulaski, and the officers of the Pulaski Veneer Company going to the head officers of the Victor Talking Machine Company.

"In these conversations * * * Mr. T. C. Coleman, president, and Mr. C. E. Richardson, general manager, [were] representing the Pulaski Veneer Company. The said Boger * * * was using his influence and representations to secure the contract between the Victor Talking Machine Company and the Pulaski Veneer Company * * * and thereby * * * obtain his five per cent commission for making said sales. * * * ,

"At one period during said conversations, the question was raised as to the solvency and ability of the Pulaski Veneer Company to carry out such a large contract, and Mr. Coleman was asked whether he would personally guarantee the ability of the Pulaski Veneer Company to carry out this large contract, and Mr. Coleman on behalf of his company said that he would make such guaranty. It will be noted that this verbal guaranty was made by Mr. Coleman * * * on behalf of * * * the Pulaski Veneer

Company, and had nothing to do with the commission contract made by C. E. Richardson with said Boger.

"Finally the contract between the Pulaski Veneer Company and the Victor Talking Machine Company was executed and the Pulaski Veneer Company obtained large orders from the Victor Talking Machine Company for the sales of its products, and these orders were the result of the personal exertions of said Boger." * * * The five per cent commissions on such sales "from the date of the execution of said contract between said two companies and the date on which Boger was discharged [by the Pulaski Veneer Corporation], amounted to * * * more than $50,000 on which there has been paid said Boger a total sum of $35,502.51, leaving due said Boger * * * the sum of approximately $17,000, the amount now under control of this court."

"Boger and Coleman had a personal contract relating to the manufacture and sale of cabinets and with the understanding that the partnership arrangements as to this matter would be finally converted into a corporation, in which after payment of expenses, the said Boger and Coleman were to share equally, and in pursuance of said arrangements, the corporation hereinafter referred to (was incorporated) on the 20th day of June, 1929. However, from April, the date on which said contract was made between * * * the Veneer Company and Boger, * * * said Boger had been actively at work carrying out his part of the program, having obtained many orders from the Victor Talking Machine Co., but the sale of cabinets was not going on so well. In fact, under the partnership arrangements between Boger and Coleman no sales of any cabinets had been made; both parties, however, were expectant and hence the corporation was chartered as agreed on. * * *

"Coleman well knew that his contract with Boger, as to the manufacture and sale of cabinets had nothing to do with the contract that Boger had made with Pulaski Veneer Corporation, * * * but he was doing so well with

his five per cent contract that it excited Coleman's cupidity, and at some time during the early part of June, 1929, Coleman, very much to Boger's surprise, demanded that he have one-half of the commissions that the Pulaski Veneer Company agreed to [pay] Boger. He did not give any reason as to why he was entitled to the sum, but simply demanded it. He did not offer to do anything on his part, paid nothing, * * * but simply demanded that he have one-half of the commission. This put respondent Boger in a very difficult position. He knew that Coleman was not entitled to any part of the commissions * * * [and] felt it was a 'hold-up,' but he knew that he was helpless. He knew that he had expended a large sum of money, time and labor in securing this contract, and that he was entitled to the proceeds thereof, but he was in a delicate position, because unless he acceded to this wrongful demand, he knew that Coleman had it in his power directly or indirectly to cause said contract to be cancelled. * * * Feeling that he had better have one-half loaf than no loaf at all, he acceded to Coleman's demand, and agreed that as to said commissions under said contract, they would go fifty-fifty. * * *

"Coleman suggested to this respondent Boger that the best way to handle this transaction so that he would get one-half of the commissions * * * would be for Boger to assign his contract with the Pulaski Veneer Company to the B. C. Sales Co., Inc., so that thereby Coleman would get one-half his commissions without his name appearing anywhere on the papers relating to said contract.

"After the verbal contract was made with Richardson confirmed by letter, it was suggested by some other parties in interest, who this respondent does not know, that the contract by which Boger was to get five per cent commission should be reduced to writing and formally acted on by the board of directors." This was finally done and the contract of June 20, 1929, was drawn up and signed by the parties. "There was no material change made in the contract from the previous one * * * [except] that the

contract of June 20, 1929, provided for cancellation within thirty days." * * *

"In pursuance of the agreement that had been made on the demand of Coleman, this contract on that day was assigned to B. C. Sales Company, Inc., so that Coleman could get his one-half of the five per cent commissions through the B. C. Sales Co., Inc., without his name appearing in any manner in relation to said contract."

"The B. C. Sales Co., Inc., has never been duly organized, no stock paid for, and in fact, it was a dummy company, this assignment was never delivered to the B. C. Sales Co., Inc., in fact there was no one to deliver said assignment to, * * * and after said assignment was made, the same was kept and held by this respondent and a copy thereof delivered to the Pulaski Veneer Company so that the checks formerly made payable to this respondent were afterwards made payable to the B. C. Sales Co., Inc., and were delivered to this respondent, and kept and used by him as and for his payment on said five per cent commission.

"Not being a lawyer he [Boger] did not know that the demand of said Coleman for one-half of said commissions was illegal and that Coleman could not collect the same, in fact he thought that Coleman could collect the same by reason of his assignment to the B. C. Sales Co., Inc., and it was while he was laboring under this impression that he testified that Coleman was entitled to one-half of said commissions by and through his assignment to the B. C. Sales Co., Inc. * * * And moreover, when he acceded to Coleman's demands, Coleman promised him that his contract with the Pulaski Veneer Company should not be abrogated, but should continue, and it has only been recently that he has been advised of the law and that on the facts stated, the said T. C. Coleman is not entitled to collect any part of said commission." * * *

"The commissions from the Pulaski Veneer Company on the contract so assigned, amounted to $50,571.44 and— said Pulaski Veneer Company with the knowledge and

approval of T. C. Coleman, paid to your respondent directly or indirectly the sum of $30,167.99, plus provisional guarantee to Hyslip and Piggly Wiggly Company, Inc., of $2,722.85, plus a note of respondent, and interest thereon of $2,611.67, a total of $35,502.51 * * * all of which disbursements the said Coleman had knowledge of, and to none of which disbursements the said Coleman objected, nor has he asserted any claim to said fund until the 24th day of June, 1931, at which time he filed his amended and supplemental answers and cross-bill."

"In the matter of the confession of judgments, he did not then believe nor does he now believe that he was indebted to said creditors, but litigation was being vigorously pressed, and he made the settlement as a matter of compromise without intent to injure anybody, and stands by and now affirms his compromise in said litigation." * * *

In his answer Boger sets forth his contention with reference to Coleman's rights as follows:

"Respondent * * * contends that the contract made between him and Coleman, by which Coleman was to receive one-half of said commissions is illegal and invalid, and that he is entitled to receive all of said commissions. for the following reasons:

"1. Said contract is illegal because * * * Coleman was president of the Pulaski Veneer Company, a director and large stockholder, and was thereby obtaining secret profits arising out of the contract between this respondent and the Pulaski Veneer Company, and said Coleman is now setting up said illegal contract as a basis on which to recover one-half of said commissions, and to him applies the maxim 'ex turpi contractu actio non oritur.'

"2. Said contract was not based on any valid consideration, this respondent was to perform the whole contract, and personally to perform the same, all of which he did. Coleman, on the other hand bound himself to do nothing, did not do anything, and there was no consideration moving between Coleman and this respondent, whereby on

Coleman's demand he agreed to give Coleman one-half of said commissions.

"3. The only thing that Coleman did agree to do was to see that his contract with the Pulaski Veneer Company was not abrogated. Coleman failed to carry out his part of said contract in that respect, in fact actively participated in causing respondent's contract with the Pulaski Veneer Company to be abrogated."

His answer closes with the prayer that, after the payment of the compromise settlement with the persons in whose favor he confessed judgments, the residue of the fund deposited in the Pulaski National Bank by Pulaski Veneer Corporation be paid to him.

The parties in whose favor Boger, through his attorney in fact, J. L. Wysor, had confessed judgments, filed before Commissioner Kegley a joint and separate answer to Coleman's answer and cross-bill.

This pleading is in large measure a recitation of the proceedings. which had been had in this cause, and an argument in support of their contention that they are entitled to have the amount which they had agreed to accept in settlement of these judgments paid out of the fund which was then on deposit in the Pulaski National Bank subject to the control of the court. It is not necessary here to recite its allegations further than to say that it denies that Boger was guilty of any bad faith or fraudulent purpose in executing the power of attorney and collateral agreement of May 14, 1930, and also emphatically denies that either the parties in whose favor Boger authorized Wysor to confess judgments or their counsel were guilty of any fraudulent or improper action in accepting the compromise settlement provided for in those instruments.

There were introduced before Commissioner Kegley statements made by the Pulaski Veneer Corporation showing the amount of commissions which had accrued under its contracts with Boger, and the payments it had

made on account thereof. These statements are practically all the evidence on these points.

The statements of commissions accrued, which are not itemized by dates of accrual further than is shown below, is to the following effect:

| | | |
|---|---|---|
| Commissions accrued from beginning of contract with Boger on sales to Audio-Vision Appliance Co................ | | $48,393.72 |
| Commissions credited to B. C. Sales Co. for sales December 11, 1929, to June 30, 1930: | | |
| On sales to Philadelphia Storage Battery Co.;...................$1,598.22 | | |
| On sales Wm. D. Schontz Co......... 240.00 | | |
| On sales to Wabash Cabinet Co...... 339.50 | | |
| | | 2,177.72 |
| | | $50,571.44 |

It is not possible to ascertain from the evidence exactly when the several items for commissions on sales to Audio-Vision Appliance Co. (Victor Talking Machine Co.) accrued. But Mr. C. E. Richardson filed with his testimony an exhibit purporting to show "Commissions credited to B. & C. Sales Company for sales made between December 11, 1929, and June 30, 1930, on which are listed only the three items aggregating $2,177.72 above listed. From this and certain other evidence of Coleman read in connection with it, it would appear that all the commissions on sales to Audio-Vision Appliance Co. accrued on sales made prior to December 11, 1929, and it is a fair inference from the statement of payments which is below set forth that at least $12,395.06 of these commissions had accrued prior to June 20, 1929.

The statement of payments made by Pulaski Veneer Corporation on account of the above commissions (all of which are shown as payments to B. C. Sales Co., Inc.) shows that the following amounts were paid during the several periods indicated in the following statement:

April 26-June 19, 1929 . . . . . . . . . . . . . . . $10,546.38
June 20, 1929, "check for commissions" 1,848.68
June 21-July 10, 1929 . . . . . . . . . . . . . . . 2,577.78

 $14,972.78

 (Injunction order entered July 11, 1929)

July 11-Sept. 5, 1929 . . . . . . . . . . . . . . . . . . . . . . . . 1,150.00

(Attachment of W. F. White served Sept. 6, 1929)

Sept. 6-October 10, 1929 . . . . . . . . . . . . . . . . . . . . . . 2,862.58

(Attachment of Pulaski National Bank, D. A.
 Smith, and second attachment of W. F. White
 served October 12, 1929)

Oct. 12-Nov. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2,172.27
Nov. 2-Nov. 4, no payments.

(Attachment of H. C. Gilmer, receiver of Fireproof
 Wood Products Corp. served Nov. 4, 1929)

Nov. 5, 1929-March 22, 1930 . . . . . . . . . . . . . . . . . . 8,313.72
March 22-May 19, 1930 . . . . . . . . . . . . . . . . . . . . . . 672.78

 (Judgments confessed in clerk's office,
 May 20, 1930)

May 23, 1930 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23.80

 $30,167.99

In addition to the above amounts paid by Pulaski Veneer Corporation it also claims to be entitled to credit for the items mentioned below:

Account due by A. E. Boger to Mark B.
 Hyslip Co. guaranteed "on condition that
 sufficient monies are due B. C. Sales Com-
 pany, Inc., when litigation is settled" . . . . $2,462.80
Account due by A. E. Boger to Piggly
 Wiggly Co., Inc., guaranteed on same
 condition as above . . . . . . . . . . . . . . . . . . . . 260.05

 $2,722.85

"Note of A. E. Boger dated March 18, 1930
 with order on B. C. Sales Company, Inc.,
 to be paid from settlement . . . . . . . . . . . . . $2,500.00
"Int. to December 1, 1930 . . . . . . . . . . . . . . . 111.67"

 2,611.67

 $5,334.52

Both Boger and Coleman testified that the proceeds of all payments made by Pulaski Veneer Corporation to B. C. Sales Co., Inc., went to Boger's hands, and were used by him either to pay the expenses of the business of making sales for the Pulaski Veneer Corporation under Boger's contracts with it or by Boger for his own purposes, and that Coleman received no part thereof. Items aggregating $1,491.21 bear some earmarks of having been used for expenses; and another $1,000.00 is shown to have been money paid to J. S. Draper, who was attorney for Boger, Coleman, B. C. Sales Co., Inc., and Pulaski Veneer Corporation. But with these exceptions it is impossible to say what part of the money went for expenses and what part to Boger for his personal use. Of these items $19.37 was paid prior to June 20, 1928, $334.28 between June 20th and July 11th, and the residue ($1,117.20) after November 4, 1929.

The amount deposited in the Pulaski National Bank on December 10 or 11, 1930, was apparently arrived at by taking the total commissions $50,571.44 and deducting therefrom the total of the payments ($30,167.99) and the two provisional guarantees (aggregating $2,722.85) making a total deduction of $32,890.84. This would leave a balance of $17,680.60, which is $11.18 less than the amount ($17,791.78) which the order of October 1, 1931, recites was deposited in the Pulaski National Bank on December 11, 1930. The record offers no explanation of this difference.

The other evidence introduced before the commissioner will be considered, so far as it may be necessary, in considering the assignments of error and cross-error.

In his report, filed February 5, 1932, Commissioner Kegley reported as follows:

(1) The judgments confessed by Boger by his attorney, J. L. Wysor, are not invalid for any of the reasons assigned by Coleman; nor is Coleman's contention well made that, notwithstanding the confession of the judgments and Boger's affirmance thereof in his answer to

Coleman's petition, and the stipulation with reference to them heretofore quoted, the codefendants were entitled to make defense as to Boger's liability on the claims asserted against him in these proceedings. On these subjects Commissioner Kegley has this to say:

"Your commissioner has reached the conclusion that the contentions of counsel for Mr. T. C. Coleman are not well taken.

"While it may be that the plaintiffs in the several attachment proceedings would not have recovered, and from a reading of the testimony, in the opinion of the commissioner there is a strong probability, at least, that the defendant, A. E. Boger, would have prevailed upon a hearing, the litigation was pending, the cases were being prosecuted in good faith, and it was entirely competent for the defendant, so far as he personally was concerned, to buy his peace upon terms as to him seemed adequate, and this furnished an entirely sufficient consideration for the confession of the judgments, which confessions involved compromises of all the claims. Whether there was an intent to defeat Mr. T. C. Coleman, the coclaimant of the fund, or not is not material, in so far as the rights of the creditors are concerned. The confessions could not be, and are not as a matter of course, operative to defeat any right of Mr. Coleman as to that part of the fund reserved to Boger in the collateral agreement.

"The contention of counsel for Coleman that confessions are without authority of law cannot, in the opinion of the commissioner, be sustained.

"The plaintiffs in all of the attachment cases prayed for personal judgment against the defendant, Boger. While one ground of the attachments in the first instance was the nonresidence of Boger, he had entered his personal appearance and was before the court, and personal judgment could have been rendered in court without further appearance, and where and whenever personal judgment may go, there may be confession. The power of attorney authorized confession in the clerk's office or in

court, and the confessions are in conformity with the statute. (Va. Code 1930, sections 6130 and 6130a.)

\* \* \* \* \* \* \* \*

"Even if there had been no personal appearance of Boger, the power of attorney executed to J. L. Wysor authorized personal appearance, and would have been sufficient for that purpose.

"Consideration of the right of a codefendant to make defense is not pertinent here. The codefendant may make defense for the principal defendant when the principal defendant is not before the court, and the codefendant can always defend for himself. The judgment cannot appropriate, or have the effect to appropriate, property or rights which do not belong to the principal defendant, and the judgments cannot have that effect in this case.

"The defendant, Coleman, had a right to intervene, as he has intervened, and to assert and establish, if he can, his claim that the defendant, Boger, had and has had no interest in the fund under the control of the court applicable to the payment of these judgments, and there is no limitation upon this right, unless and except in so far as the defendant, Coleman, has himself fixed the limitations, if he has done so. At the most, and at all events, the confessions as between Coleman and the judgment creditors, and as between Coleman and Boger, do not go beyond appropriating to the creditors so much of the fund as is necessary to discharge the amount to be received by the creditors. As to the residue, the fund is unaffected by the assignment, or by anything that may have been done to diminish the fund to a point affecting Coleman's rights, if any."

(2) The history of the formation and the facts with reference to the ownership of B. C. Sales Company, Inc., are as follows:

"Sometime in January, 1929, Mr. A. E. Boger, who was then interested in other enterprises in Pulaski, conceived a plan for the manufacture and sale and distribution of radio cabinets. The cabinets were to be manufactured

by Coleman Furniture Company, of which T. C. Coleman was president. Boger's part was to market. Mr. T. C. Coleman became interested with him in the marketing project, on a fifty-fifty basis. The cabinets were to be sold on a commission basis and commissions were to be divided between Boger and Coleman. Plans were made and some cabinets manufactured and put on exhibit, but the enterprise did not get a start and was later abandoned. * * *

"Along in April, 1929, the matter of manufacturing and selling veneers and panels was taken up by Mr. Boger with C. E. Richardson, general manager of the Pulaski Veneer Corporation, as a result of which a contract was entered into, evidenced by letters between the Veneer Corporation and Mr. Boger, for the sale of these products by Boger on a commission of five per cent. The customer in prospect was the Victor Company, which had a factory at Camden, New Jersey, with which Mr. Boger had contact, and arrangements were made with the Victor Company for manufacturing and shipping these products on a large scale. The name of Mr. T. C. Coleman does not appear in these negotiations. It does not appear that Mr. Coleman had taken part in the first instance in securing the contract with the Victor Company, but it is claimed that the contract could not have been secured except for his undertaking to give his personal attention to the manufacturing end of the transaction and his personal assurance that it would be carried out."

"It appears in the record of the organization of the B. C. Sales Company, Inc., * * * that the subscription to capital stock prior to organization was executed April 22, A. D. 1929, the subscribers who were mere organization subscribers, subscribing a total of ten shares of the par value of $100.00 each. * * *

"Application for charter * * * was filed 17th day of June, 1929, and the certificates of incorporation issued 19th day of June, 1929. * * * The first meeting was held the 19th day of June, 1929, when the shares subscribed

by these three persons were assigned * * * four shares to A. E. Boger, * * * three shares to T. C. Coleman, and * * * three shares to T. R. Boger, Jr. The minutes of the first meeting show these transfers and the election of A. E. Boger, T. C. Coleman and T. R. Boger, Jr., as directors. The minutes of the first meeting of the board of directors, held July 2, 1929, in New York City, show the election of A. E. Boger, president, T. C. Coleman, vice-president, and T. R. Boger, Jr., secretary-treasurer; recite * * * a subscription to the capital stock of A. E. Boger of ninety shares, and certain other proceedings not necessary to note. The only other meeting recorded is one held * * * [in] New York, July 7, which minutes recite those present, A. E. Boger * * * and T. R. Boger, Jr. This is apparently a directors' meeting. The meeting voted to A. E. Boger a salary of $1,000 per month and expenses, and recites the resignation of T. C. Coleman as vice-president and director and recites waiver of notice of the meeting signed by all the directors.

"It appears in the evidence, and is undisputed, that no stock was ever issued to any one and no capital paid into the corporation. Mr. Boger testifies that the corporation did have an office in New York, kept a set of books,[3] and it appears that the commission account with the Pulaski Veneer Corporation was kept in the name of B. C. Sales Company, Inc., from April 30, 1929, on. * * *

"From its organization on A. E. Boger personally handled these sales matters, and apparently without passing all of the funds through the B. C. Sales Company, Inc.

"Although the set-up of this corporation was not complete under the laws of Delaware it became a body corporate upon the issuance of the certificate of incorporation, invested with corporate powers, and was competent to receive the transfer of the commission contract from A. E. Boger, and to carry on this transaction in its corporate name and your commissioner is of opinion that

[3] So far as the record discloses this "set of books" was not introduced in evidence.

the commissions arising under the contract from the date of assignment on were the property of the B. C. Sales Company, Inc.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"Now as to the actual ownership of the corporation, disregarding the form and dealing with the substance, there can be little, if any, doubt that A. E. Boger and T. C. Coleman were, in fact, the owners in equal interests. The incorporation was brought about through them although Boger was apparently the active agent, and looking to the preliminary subscription the project was apparently launched about the time or directly following the sales agency contract of April, 1929. There is no explanation of delay in perfecting the organization. However, upon the execution of the sales agency contract, this was immediately transferred to the B. C. Sales Company, Inc.

"The corporate records, so far as these may indicate a different interest, should be disregarded. They do not reflect the truth as to the resignation of Coleman as vice-president and the subscription of A. E. Boger to the ninety shares, if made, was in violation of Coleman's rights. The overwhelming weight of the testimony is that Coleman was equally interested with Boger in the corporation and in profits that the corporation might make."

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"It is contended by counsel for Boger that the assignment of the commission contract with B. C. Sales Company, Inc., was inoperative because not accepted by the assignee. It is true that there is no corporate record of the acceptance, but there is ample evidence of acceptance in fact and this is sufficient."

In connection with this part of the commissioner's report, it may be noted here that Coleman testified that he was not present at the meeting of July 7, at which A. E. Boger and T. E. Boger, Jr., voted A. E. Boger a salary of $1,000, had no notice of the meeting and had never heard of it until the records were produced before the commissioner. Boger was asked by his counsel with reference

to Coleman's testimony on this subject: "Have you any recollection on the subject as to whether he [Coleman] was present or whether his statement is correct or not?" To which he replied, "I cannot answer that. He was not present, and I imagine his statement is correct if he made it. He should have gotten a notice. They were supposed to be sent out." It should be further noted that Boger does not testify that there was ever any agreement between Coleman and himself that he (Boger) was to receive any salary allowance as a part of the expenses of the business; and Coleman testified positively that Boger was to receive no salary.

The evidence introduced before the commissioner amply sustains all the facts stated and the conclusions reached by him with reference to the incorporation of B. C. Sales Co., Inc., and the respective interests of Coleman and Boger therein and we shall not refer further to this evidence.

(3) The agreement between Boger and Coleman that Coleman should share equally with Boger in the net commissions arising under the commission contract between Boger and Pulaski Veneer Corporation, and the assignment by Boger of the contract of July 20, 1929, to B. C. Sales Company, Inc., are not void or voidable by Boger for any of the reasons assigned by him. On this subject the commissioner says:

"The right of Coleman to claim direct or through the corporation any interest in the commissions growing out of the sales contract is challenged on various grounds. It is claimed that the alleged contract with A. E. Boger to share commissions was violative of Coleman's trust as a director and president of the Veneer Corporation; that it was without consideration; that the agreement on the part of Boger was brought about through coercion; that a court of equity will not lend its aid to enforcement of any rights claimed by Coleman under the alleged agreement; that in fact no contract was entered into, and that the consideration, if any, has failed.

"That there was an agreement or understanding between Boger and Coleman that Coleman should share equally with Boger in the matter of net commissions arising under the commission contract is fully sustained by the evidence. It was admitted, by Mr. Boger in his testimony formerly given in these causes and substantially admitted in the testimony given before the commissioner. The testimony of Mr. Draper, one of the directors of and attorney for the Veneer Corporation, and of other witnesses, show, and the records of the Veneer Corporation show, that it was understood that Coleman was interested in the commissions; and, in addition, is the testimony of Mr. Coleman. The questions of lack of consideration and coercion would seem to be foreclosed by the assignment of the contract to the B. C. Sales Company, Inc., through which it was intended that Coleman would receive his net share in the commissions. Apart from this, the evidence does not support the contentions of counsel for Mr. Boger on these points. The claim that, as between Boger and Coleman, Coleman's right to commissions has been defeated by his failure to keep the contract alive is not, in the opinion of the commissioner, well founded. It appears that the sales agency was terminated at the instance of the customer. Coleman could not have kept it alive, and would not have been justified in undertaking to do so, to the detriment of the interest of his company.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"The next question in order is whether the contract to share commissions was violative of Coleman's trust as president and director of the Veneer Corporation.

"It is a well recognized principle that the acts of officers occupying a fiduciary relationship to a corporation, in dealing with their corporation, are subject to closest scrutiny, and this is as it should be. The officer cannot perhaps in any case derive profit for himself at the expense of the corporation without authority from or ratification by the owners, that is, the stockholders. It does not follow, and certainly modern practice does not sup-

port the contention, that he cannot receive compensation for services rendered, or share in the compensation received by others, without authority from the stockholders, or ratification by the stockholders. The business of corporations is carried on by the board of directors, and the board of directors generally represent the stockholders in matters authorized or approved by them, so long as they act in good faith and without detriment to the interest of the stockholders. (He here cites *General Finance Corp.* v. *Keystone Credit Corp.* (C. C. A.) 50 F. (2d) 872, at p. 883.)

"In this case the commission contract was for the usual and fair commission upon sales. The contract was a valuable one to the selling corporation, and the assurances given by Coleman to the Victor Company in aid of securing the contract and his activities in carrying it on were in the interest of the selling corporation. He was a nonsalaried officer and his undertakings and activities apparently went beyond the performance of the ordinary duties of his office as president.

"The fact that he was interested was known to some of the directors, if not all, and thus known to a large, if not controlling stockholders' interest at the time the written contract of June 20, 1929, was entered into. His participation in the commission was specifically approved by the directors of the Veneer Corporation at their meeting in December, 1929, and although the minutes of the stockholders' meeting do not show this, it is in evidence that the minutes of directors' meeting were read to the stockholders' meeting following, and approved. * * *

"The Veneer Corporation is not complaining, and would not, in the opinion of the commissioner, prevail, if it were complaining."

The remaining question is whether the contract is of such a character as to come within the condemnation expressed in the case of *Williams* v. *Kendrick,* 105 Va. 791, 54 S. E. 865, and cases of like character.

"The principle followed in that and similar cases is not,

in the opinion of the commissioner, applicable to the case at bar.

"In *Williams* v. *Kendrick,* the parties contracted with the agent of the seller to share with the agent one-half the commissions of the sale of land, to be priced by the owner at $8 per acre and sold at $12 per acre, with purchaser then in sight. The court held that the contract was a corrupt one on the part of the agent of the seller, as well as upon the part of the parties to the suit and that no action could be maintained on any matter growing out of it. The action of the agent for the landowner in that case was clearly and grossly in breach of his trust and was without the knowledge of his principal, and it was the duty to disclose to a principal that the land could be sold for fifty per cent advance over the price that had been put upon it.

"Here the Veneer Corporation was securing a contract of great value to the corporation and was securing the selling service at a fair commission, and, in fact, at a lower commission than had been paid in some instances, and even if the interest of Coleman in the commission had been a secret one, unless a higher commission was secured because of this interest, his contract to share was not in violation of his trust as an officer and director, was not to the detriment of his corporation, and not of that character condemned under the principal stated in *Williams* v. *Kendrick* above cited."

(4) "It is claimed on behalf of Coleman that Boger has received his full share, or more than his full share, of commissions under the sales contract, and this is probably true, if all payments from April 30, 1929, on are taken into account.

"If only the commissions paid after the contract of June 20, 1929, are taken into consideration, the payments on account of commissions would still exceed the amount of the fund under control of the court. This, however, does not take any account of expenses, as to which the evidence does not furnish a basis for making a finding.

In any event, after payment out of this fund of the amount payable on the judgments confessed by J. L. Wysor, attorney in fact, the balance would probably be insufficient to equalize Coleman directly or through B. C. Sales Company, Inc., in the net commissions.

"It is contended on behalf of Coleman, as hereinbefore noted, that the payments on commissions after the injunction order, were necessary in order to keep the contract with the Veneer Corporation going, and that Coleman should not be prejudiced by such payments because the claims asserted in the attachment proceedings were not such as would have been sustained, if those proceedings had gone on to final adjudication by the court, and that as to the judgments, the judgment creditors are only entitled to what would be coming to Boger upon a settlement of the respective rights of Boger and Coleman.

"In the opinion of the commissioner, this position cannot be sustained. The payments after the attachments were served and after the injunction order was issued were made with the knowledge and assent of Coleman and were made at his risk, in so far as his rights in the matter were concerned. The litigation was pending and being vigorously prosecuted, and Coleman took the risk not only of final adverse judgment by the court but of a judgment by confession or default, and in the opinion of the commissioner there is no showing of sinister motive on the part of the creditors and Boger to defeat the judgments."

(5) The $17,791.78 fund in the hands of the court should be distributed as follows:

"The portion of said money to be distributed to the attaching creditors is the sum of $7,000, to be distributed ratably on the judgments confessed by J. L. Wysor, attorney in fact, in the attachment proceedings, as follows, interest computed to February 6, 1932: [Here are set forth the amounts of the judgments confessed in favor of the eleven parties named in the power of attorney of June 14, 1930, together with the cost of confessing each judg-

ment and interest computed thereon from January 1, 1929, to the date of the report, making a total of $17,-582.20.]

"The balance of the fund of $17,791.78 after payment of any costs and expenses, is distributable to A. E. Boger and T. C. Coleman, upon settlement of their respective interests in the entire net commissions under the sales agreement of June 20, 1929, upon the basis of one-half net commissions to each. Boger's interest would be one-half net less the $7,000.00 to be paid on the judgments confessed by J. L. Wysor, attorney in fact, and less any net commissions already received by him after deducting sales expenses.

"It appears from statement filed by the Veneer Corporation that total commissions from sales to Audio-Vision (the Victor contract) are $48,393.72. In addition to this was commissions on sales to Philco $1,598.22, Schantz $240, and Wabash $339.50, totaling $2,177.72, and making a total of all commissions of $50,571.44.

"If the $2,177.72 went into B. C. Sales Company, Inc., these commissions should be treated in the same way as commissions on sales to the Victor or Audio-Vision.

"The balance due on commissions is $20,403.45. The Veneer Corporation has taken credit against this balance for provisional guaranty to Mark Hyslip Co. $2,462.80, and Piggly Wiggly, Pulaski, $250.05, totaling $2,732.85, leaving net balance of $17,680.60, or $110.93 less than the amount on deposit.

The total commissions actually paid from and including April 30, 1929, to March 28, 1930, is $30,167.99. Of this amount $11,936.48 was paid prior to June 20, 1929, and $19,230.61 since June 20, 1929. If the check of June 20, 1929, for $1,848.68 was for accrued commissions, this should be added to the $11,936.48, making $13,785.16 received by Boger on commissions prior to the assignment of the contract of June 20, 1929, and $17,381.93 subsequent to and under the said contract, to which should be added $2,722.80 guaranty making total $20,104.73 paid to B. C.

Sales Company, Inc., and apparently chargeable to A. E. Boger, subject to deduction for expenses.[4]

"The record does not furnish a basis for determining the net amount chargeable to Boger. If a basis for distribution of the fund under the control of the court is to be fixed upon the record as it stands the only suggestion your commissioner could offer would be to take the $20,403.45 [5] as such basis, and after payment of costs and expenses divide this into two equal parts and charge to Boger's one-half the $7,000 payable on confessed judgments and the provisional guaranty, amounting to $2,722.85, and distribute one-half net to Coleman and one-half net, after satisfying the charges aforesaid, to Boger.

"There is nothing in the record to indicate that sales expenses have not been covered by payments already made by the Veneer Corporation. The amounts so paid would seem to have been ample, if not more than ample, for that purpose.

"There has been paid by Pulaski Veneer Corporation to B. C. Sales Company, Inc., or A. E. Boger, or both, since July 11, 1929, on account of commissions growing out of the written contract between said Boger and Pulaski Veneer Corporation, all of which has apparently passed to said Boger in liquidation of expenses, or otherwise, or for his personal use, the aggregate sum of $15,087.65." [6]

\* \* \* \* \* \* \* \*

"In the foregoing discussion and findings in respect to the interest of A. E. Boger in net commissions and stock in B. C. Sales Company, Inc., it is to be understood that such interests are controlled by the assignment of May 14, 1930, from A. E. Boger and T. R. Boger, Jr., to J. L. Wysor."

---

[4] We have not been able to reconcile many of the figures in this paragraph with the figures given in the account filed by Pulaski Veneer Corporation.

[5] $50,571.44 less $30,167.99.

[6] According to the statement filed by Pulaski Veneer Corporation, this figure would be $15,195.15.

On February 8, 1932, Commissioner Kegley filed this supplemental report:

"It was and is now the view of the commissioner that the judgment creditors of A. E. Boger to the extent of the $7,000, without interest to this date, are to be paid at all event, and if Boger's one-half of the balance of $20,403.45 due B. C. Sales Company, Inc., after payment of costs and expenses, is insufficient to pay the $7,000 payable on the confessed judgments, and also the $2,722.85 provisional guaranty, for which the Veneer Corporation has taken credit on its statement filed, the $7,000 should be paid in full.

"Your commissioner does not pass upon the right of the Veneer Corporation to the provisional credit of $2,722.85, since the record does not show that these payments have actually been made.

"The paragraphs in the original report and in this supplement are based upon the assumption that the Veneer Corporation is entitled to the credit.

"This was the view of the commissioner at the time of making up his report, but since the commissioner was under the impression then that the fund would be sufficient to take care of both credits it was not expressed more definitely."

Exceptions were filed to Commissioner Kegley's report by A. E. Boger, Pulaski Veneer Corporation, B. C. Sales Company, Inc., John W. B. Deeds, receiver for B. C. Sales Company, Inc., and T. C. Coleman. It is not necessary to set out these exceptions further than to say that they raised all the questions which are raised in the assignments of error and cross-error.

On July 18, 1932, the court entered the decree here appealed from. After reciting the report of Commissioner Kegley and the exceptions of the several parties thereto, this decree reads, so far as it is here material, as follows:

"Upon consideration whereof, it is adjudged and decreed that the said exceptions be and they are hereby severally overruled, and said report is confirmed.

"It is considered by the court from the evidence and from said report and adjudged:

"That on the 10th day of December, 1930, Pulaski Veneer Corporation paid into and deposited in Pulaski National Bank, subject to the orders of this court, herein the sum of $17,791.78 as the full amount it claimed to be indebted on that day to B. C. Sales Company, Inc.;·

"That Pulaski Veneer Corporation, the garnishee in the attachments against A. E. Boger and a defendant in these chancery causes, had paid to A. E. Boger or to B. C. Sales Company, Inc., or both, prior to December 10, 1930, and after July 11, 1929, the date of the first injunction order of this court herein, and while the injunction orders of this court were in effect and the liens of the attachment rested upon the interest of A. E. Boger in B. C. Sales Company, Inc., the sum of $15,087.65;

"That the payment of the sum last aforesaid was made by Pulaski Veneer Corporation with the consent and upon the advice of said T. C. Coleman;

"That A. E. Boger and T. C. Coleman were on the 20th day of June, 1929, and now are, the sole owners of B. C. Sales Company, Inc., in equal proportions;

"That the sum first aforesaid of $17,791.78, paid into bank by said Veneer Corporation, is the total amount which was due on December 10, 1930, from said Veneer Corporation to said B. C. Sales Company, Inc.; there being an error in calculation in said report in adding to the amount so deposited the provisional guaranty made by said Veneer Corporation for A. E. Boger to pay Mark B. Hyslip Co. $2,462.80 and Piggly-Wiggly Pulaski Co. $260.05 on the supposition that these two items had been deducted in arriving at the amount so deposited;

"That the creditors of A. E. Boger hereinafter named, by reason of their attachments and by reason of the injunction orders and other orders of this court, have prior liens on the one-half interest of A. E. Boger in the commissions owing and accrued to B. C. Sales Company, Inc., from Pulaski Veneer Corporation on and after July 11,

1929, under a contract dated June 20, 1929, between said Veneer Corporation and A. E. Boger, which contract was on that day assigned by A. E. Boger to B. C. Sales Company, Inc.;

"That the remainder of said fund on deposit in Pulaski National Bank, Pulaski, Virginia, including interest paid by the bank to this date thereon, and after deducting amounts heretofore ordered by this court to be deducted and paid therefrom, is $16,047.15 as of July 18, 1932.

"It is further adjudged, ordered and decreed that:

"Pulaski National Bank, H. C. Gilmer, receiver of Fireproof Woods Corporation, H. C. Gilmer, receiver of Cheves Lumber Company, D. A. Smith, receiver of Rocky Gap Flooring Co., W. F. White, trading as W. F. White Lbr. Company, F. L. Quesenberry, Pulaski Engineering Works, Virginia Hardwood Lbr. Co., Standard Oil Co. of New Jersey, Midland Valley Lumber Co., James McGraw, Inc., recover and be paid from the amount last aforesaid on deposit in these causes in Pulaski National Bank, Pulaski, Virginia, in the name of J. N. Bosang, clerk of this court, the sum of $7,000.00, with interest thereon from the 6th day of February, 1932, to be distributed ratably among them in proportion to their several judgments and in full discharge thereof, and their costs severally, which judgments with interest to February 6, 1932, are respectively set out in said report as follows:

"Pulaski National Bank...........................$3,262.58
H. C. Gilmer, Receiver of Fireproof Woods Corporation ........................................... 3,445.66
H. C. Gilmer, Receiver of Cheves Lumber Company 4,158.16
D. A. Smith, Receiver of Rocky Gap Flooring Co... 2,917.06
W. F. White, trading as W. F. White Lumber Co... 1,899.04
F. L. Quesenberry................................. 717.19
Pulaski Engineering Works........................ 269.38
Virginia Hardwood Lbr. Co........................ 363.00
Standard Oil Co. of New Jersey................... 64.07
Midland Valley Lumber Co......................... 337.50
James McGraw, Inc................................ 147.55

"It is further ordered and decreed that J. N. Bosang, clerk of this court, do forthwith pay by his checks drawn on said bank against said deposit:

"(1) The taxable costs and expenses connected with these causes, including the fees and expenses of W. B. Kegley, commissioner, and one per cent commission on said deposit to said clerk as custodian thereof;

"(2) One-half of the balance of said deposit, after payment of the costs and expenses aforesaid, to T. C. Coleman in payment of his one-half interest therein as shown by said report;

"(3) Seven thousand dollars with interest thereon from the 6th day of February, 1932, of said balance, after paying the costs and expenses aforesaid, to J. L. Wysor, attorney for the said creditors of A. E. Boger, which sum is hereby charged against the one-half interest of said Boger in said balance, in full settlement and discharge of the judgments aforesaid;

"(4) The residue of said balance, if any, representing the remainder of A. E. Boger's portion thereof, ratably to Mark B. Hyslip Company and Piggly-Wiggly Pulaski Company, on $2,462.80 and $260.05, respectively, guaranteed to be paid to them by Pulaski Veneer Corporation, provided a balance remains in favor of said Boger, after the settlement of these causes, out of which such payment could be made. An the clerk shall report his disbursements to court."

To preserve orderliness of treatment we shall take up the assignments of cross-error by Boger before considering the assignments of error made by the original appellants.

Boger's assignment of cross-error is that the commissioner erred in reporting and the court erred "in decreeing that T. C. Coleman was entitled to any portion of the impounded fund." In his petition for an appeal he thus epitomizes his reasons for this assignment of error:

"It is contended by T. C. Coleman that he is and was entitled to one-half of the commissions earned by A. E.

Boger under his contract with the Pulaski Veneer Corporation, which commissions were assigned to the B. & C. Sales Company, Inc., and he bases his right to this one-half interest on the assignment of this fund.

"It is denied by A. E. Boger that this assignment transferred to Coleman a one-half interest in the commissions earned by him, (1) because Coleman being president of the Pulaski Veneer Corporation could not acquire an interest in the subject matter of the contract between the Pulaski Veneer Corporation and a third person; (2) because there was no consideration for the assignment, and if any, there has been a total failure thereof; (3) because even if the court may hold that Coleman had a right to make such a contract, and it was supported by a consideration, yet the assignment was made under a duress exercised by Coleman for the purpose of compelling Boger to surrender the fund to which he alone was entitled; (4) because even should Coleman be correct as to the above proposition, yet this fund was partnership capital, and upon dissolution of the partnership it shall be returned to Boger."

The determination of the questions raised by this assignment of cross-error requires an examination of the evidence bearing upon them; and upon an examination of the evidence we are of opinion that none of the contentions made thereunder are well made.

We have heretofore set forth the testimony given by Boger in his deposition taken about March 22, 1930. His testimony before Commissioner Kegley bearing upon these (and some other) points, given in his own words as far as is practical, is as follows:

Mr. Coleman (who was president of Coleman Furniture Company and also of Pulaski Veneer Corporation) and I decided it would be a good thing to form a sales and distribution company for the sale of radio cabinets to be manufactured at Coleman furniture plant and other plants, to the radio manufacturers. We formed * * * a copartnership along the lines—about January—of the sale

of radio cabinets. * * * We tried to interest various manufacturers in the purchase of cabinets to be manufactured at the Coleman plant. And at that time we decided to form a corporation called B. C. Corporation, and to open offices in New York, and to distribute the manufactured article of cabinets. * * * That corporation was formed about June (1929).

The cabinets were to be made by Coleman Furniture Company. We were to get a commission of $2.00 on each of the cabinets. That would be $1.00 to each of us * * * I was to get $1,00, and Mr. Coleman $1.00.

In the spring of 1929 I made a contract with Pulaski Veneer Corporation to sell panels manufactured by it to the Victor Talking Machine Company on a commission. This contract was a verbal contract made with me individually by Mr. Richardson, secretary-treasurer of Pulaski Veneer Corporation. Later "I think it was April 26th," Mr. Richardson wrote me a letter embodying my agreement. This letter was written to me. "Mr. Coleman's name had nothing to do with the contract."

After I had made this verbal contract and had received this letter, "Mr. Coleman said something about that the five per cent on the panels would help defray the expenses of the B. C. Sales Company to carry on our cabinet work, and at that time I thought we were going to build cabinets." Later on two occasions Coleman and myself had a conversation about the five per cent commission contract, but "nothing of any importance though up until the time the new contract was made."

The contract of June 20, 1929, was drawn by Mr. John Draper and Mr. Frank Wysor, I believe, "or in Mr. Draper's office—I don't know by whom." The only material difference between my verbal contract which had been confirmed by letter and the formal contract of June 20, 1929, was that the latter had a clause in it providing that it could be cancelled on thirty days notice. "That was something I took exception to and there was quite a discussion of that going up on the train that night after it

was signed. We had just a few minutes to catch the train, and I really had not digested the contract until on the train, and Mr. Coleman and I had quite a discussion of the contents of the contract."

After testifying that Mr. Coleman was the first to suggest that he get a part of the commissions and that he did so before the assignment of the contract of June 20th to the B. C. Sales Company, Inc., Boger was told by his counsel to go ahead and state in his own words the circumstances and details surrounding this. Continuing his testimony in response to this he said:

"Our relations were formed for the purpose of selling cabinets. Then the panel proposition came as an aftermath—really as an accident. I called Mr. Richardson on the 'phone and told him I thought I could sell the output of the Pulaski Veneer Corporation, which was then Virginia Panel Company. The concern was very small and I thought we could make doors * * * for Victor, and Mr. Richardson said, "I will give you five per cent commission, and Richardson said I started negotiations with Victor, and * * * [we] took a contract for doors and some taped up facing. * * * Afterwards Richardson wrote me a letter confirming the statement he had made that he would give me five per cent. * * * Either at that time or the time right after that, Mr. Coleman said to me that that could go into the 'kitty' * * * the pot, into the fund to use for expenses of the B. C. Sales Company, and we did not think the panel business would amount to much as we first started. He said it may help to defray the expenses, because I was paying my own, and it was running into quite a sum. Then the question of the five per cent did not come up—it may have been discussed, but I don't remember just exactly how—until the new contract was drawn, and I said to Mr. Coleman that I did not like it. * * * We discussed it on the train, and Mr. Coleman said, 'I will see that the contract is perpetuated. You don't have to worry about the cancellation clause.' I was very much upset for the simple reason that I had

made the connection, and I could not go back to Victor and say I did not want to do business with Pulaski Veneer Company and still I wanted to get my earned money. * * * He said, 'I will see that the contract is perpetuated and we will put this into the B. C. Sales Company, and will go fifty-fifty and of course in it went. I used the money for expenses and the B. C. Sales Company never functioned for the purpose of which it was organized, and the sale of the veneers was solely upon my efforts and energy and the contract made solely on my efforts and energy, and I could not see that the money should not be spent by me, and should not be my money, because at the time Mr. Coleman cancelled my contract, and after he cancelled my contract, he had not fulfilled his promise, because the connection with Victor had been made, and the Pulaski Veneer Corporation was running, and I had spent my money and I was outdoors. The contract had been cancelled and my money tied up, and I was not compensated for my work, but Pulaski Veneer Corporation had been taken out of a small concern, and was enjoying a large and prosperous business. I have never felt like the part Mr. Coleman promised had been lived up to for the simple reason that we did not go on with our major business of making cabinets, and the very thing he agreed to do was wiped out by him on the long distance telephone in Camden when I was in the room with Mr. Richardson and my brother, when Mr. Coleman said I could not represent Pulaski Veneer Company any longer.

*　　*　　*　　*　　*　　*　　*　　*

"Q. Did Mr. Coleman contribute anything to the performance of the duties under this agreement?

"A. All he did was to go up and figure on the prices on veneers, as a representative of Pulaski Veneer Corporation.

"Q. Do you recall when it was agreed that Mr. Coleman should have one-half of the five per cent commissions due you under the contracts?

"A. It was prior to this contract of June 20, 1929, I was

in a very ticklish position there. ·I had my business, and I could not afford to lose it. I made the connection, was not doing anything else, and I had to play ball with Mr. Coleman on it.

"Q. Did Mr. Coleman make any assurances to you?

"A. He assured me that the contract would be perpetuated, that I would never have any trouble as long as I played ball.

\* \* \* \* \* \* \* ·\*

"Q. You were afraid you would lose your contract?

"A. It was in Mr. Coleman's power to cancel the contract, and he did cancel it, and I had worked up the business, and if I lost it, I would lose about forty or fifty thousand dollars a year. So· I was between the devil and the deep blue sea.

\* \* \* \* \* \* \* \*

"Q. Going back to the conversation that occurred between you and Mr. Coleman just prior to the contract of June 20th at which time Mr. Coleman made the demand or request of you \* \* \* that he should have half of the five per cent commissions. Did he state to you at that time or any other time, on which grounds he thought he was entitled to this half of the five per cent commissions?

"A. On the ground of the old B-C Cabinet Company is the only ground I·ever heard Mr. Coleman say he wanted to get in on the commissions." But that contract did not have anything to do with the contract that I afterwards obtained from the Veneer Company. "We never gave panels a thought."

\* \* \* \* · \* \* \* \*

When questioned by his counsel with reference to his testimony in his deposition formerly given, Boger said:

"At the time those depositions were taken, I made the statement that \* \* \* Mr. Coleman was entitled to half of the commissions after the expense—under certain conditions. I think you will find it there, and those conditions were the perpetuation of the contract." (He said nothing about this condition in his former testimony). At the

time I testified before I had not been advised that "if Coleman had paid no consideration for two and one-half per cent, he should not be entitled to receive that." I was depending upon Mr. Draper and Mr. Campbell (who also represented Coleman and Pulaski Veneer Corporation) for advice. At that time I had never given a thought to the "question of Mr. Coleman's being president and director and stockholder in the Veneer Corporation and receiving commissions at the same time," and "the legal information that it was improper" had not been brought to my attention when I testified before. The pleadings which I signed as an officer of the B. C. Sales Company, Inc., were prepared by Mr. Draper and Mr. Campbell.

The testimony of other witnesses shows that Boger was at the time the contract of June 20, 1929, was executed a director and a vice-president of Pulaski Veneer Corporation. With reference to this he testified:

I was made vice-president of Pulaski Veneer Corporation "at my suggestion; and the suggestion of the Pulaski Veneer Corporation—for sales purposes;" but it was an honorary position. I did not own any stock in it, or have any pecuniary or beneficial interest except "the interest of getting the commissions * * * and pride in seeing the success."

With reference to the payments made by Pulaski Veneer Corporation on account of commissions, accrued under his contracts with it and for what they were used, Boger's testimony was to this effect:

Prior to the time of the incorporation of B. C. Sales Company, Inc., the checks drawn by Pulaski Veneer Corporation "were made out in my name, I guess. I cashed them that way." After the incorporation of B. C. Sales Company, Inc., "the checks were made to B. C. Sales Company." Some of them were deposited by B. C. Sales Company, Inc., and paid out by check "and some were just endorsed and cashed here at the local bank. The money was used for expenses and usually we were getting it as quickly as we could to spend. * * * The B. C. did not have

a bank account, but there were few checks went into it. Most of them were cashed right here in town." I ultimately got all the money from these payments, and "got the benefit of all the checks issued by the Veneer Company except as to expenses and checks paid lawyers." There was an account book kept of the B. C. Sales Company, Inc. It was kept in New York by my brother. The book was delivered to some of the lawyers connected with this case, and I don't know where it is now. There were eight or nine pages of it written on. (This book was not introduced in evidence.)

In this connection he was asked the following question by Commissioner Kegley:

"Q. What I want to get at is whether and to what extent B. C. Sales Company ever functioned as a corporation in respect to this contract?

"A. *I* never functioned as much of a corporation. It had an account at the Corn Exchange Bank in New York, but most of the checks were cashed right here."

With reference to the cancellation of his commission contract by Pulaski Veneer Corporation, Boger's testimony is very meager. The sum total of it is this:

I received a letter from Pulaski Veneer Corporation written by Mr. Richardson, dated May 13, 1930, reading in part, "In accordance with our verbal understanding this is an official notice of the severance of your connection with the Pulaski Veneer Corporation in all capacities whatever." But "that was not the understanding."

Told by his counsel to "tell what it was," he continued:

"In May, 1930, Mr. Richardson was at my house and the question of the 1930 business of the Victor corporation came up. We already had the Victor business, and Mr. Richardson was up there, more or less handling that, because it was just a question of working out specifications. I was working very hard trying to get the Philco account for Pulaski Veneer Corporation. I was over there with Mr. Richardson and went in to see Mr. Donahue. Mr. Donahue went down there, and I said, 'Don, what is the

matter, we cannot get the business lined up?' He says, 'Who are you with?' I said, 'What do you mean, who am I with?' I said, 'I am with Pulaski Veneer Corporation.' He said, That is strange. I have been notified that you are not with Pulaski.' I said, 'God, I have not heard it. It is news to me.' I called up Weiland and went over to see him. Mr. Weiland said he thought it a dirty trick, and he wanted me to have the business. I went back to the hotel and talked to Mr. Richardson about it. Chick said, 'There is something rotten in Denmark. They tell me one thing, and you another.' * * * Richardson called Mr. Coleman on long distance, and told him * * * just what had transpired. I could not hear Coleman's conversation, but it was that there was nothing doing. Mr. Richardson turned to me and said, 'You go ahead and handle Philco, and maybe this thing will work out,' and I laughed in the best of humor. We went down to lunch. It did not bother me. Mr. Richardson said, 'You are taking it good natured.' When Mr. Richardson returned home I received the letter, and that was the only time I knew officially I had been—in writing, that my contract had been made null and void by Pulaski Veneer Corporation. In the conversation between Richardson and Coleman, I heard Mr. Richardson say that he thought he was acting too hastily. He was referring to discharging me. The letter was written to me, not to the B. C. Sales Company, Inc."

While we are considering Boger's testimony, it will be well to state his testimony with reference to the confession of judgments.

Being told to state in his own words the circumstances surrounding the confession of the judgments, he said:

"Well, after I had been notified that I was no longer with Pulaski Veneer Corporation, and I could not seem to get anywhere with my various law suits down here, I wanted to get the matter settled up, and get what was coming to me; and Mr. Gilmer and Mr. Calfee met me in Washington, my brother and I, and said that it looked like the only way I could get any money would be to

confess the judgments, and clean it up that way. That Mr. Coleman was going to fight me tooth and nail. I did not owe the money and do not owe it yet, but I had a perfect right to adjust or settle a claim as I see fit with my own money. At the time.I settled it I said I did not owe the money and that was all agreed upon that I did not owe the money, but I could not seem to get anywhere in the courts, and I made the settlement of my own free will, without force or promise."

Mr. John S. Draper was introduced as a witness by the appellants. He testified that he has been a director of, vice-president of and counsel for Pulaski Veneer Corporation since its incorporation, that in the earlier stages of this litigation he represented not only it and Coleman, but also Boger; and that he was personally familiar with what took place at the time the Pulaski Veneer Corporation originally procured the business of the Victor Talking Machine Company. On this last subject he says:

"In the spring of 1929, Mr. Weiland, vice-president of the Victor Talking Machine Company and Mr. Keifer, superintendent of construction of the Victor Company, came to Pulaski at the instance of Mr. A. E. Boger, and an effort was made to convince the Victor people that panels could be furnished from Pulaski. These two gentlemen went over the situation and were skeptical as to the ability of the veneer and panel corporations to furnish these panels. * * * Their doubt about the ability of the two companies, which were afterwards merged into the Veneer Corporation, to furnish panels was relieved by Mr. Coleman. * * * Both companies were at that time in more or less financial straits, * * * and he assured them that he would give the matter sufficient time and if necessary, financial backing, and in short, assured them if the contracts should be awarded, that he would stand personally behind the contracts; and afterwards, he and Mr. Boger entered into a contract as to the commissions. I remember distinctly discussing the question of commissions with the directors of the companies, and Mr.

Coleman stated that he could not give this matter his personal time and attention without salary, and without compensation, and it was thoroughly understood between the directors that he was to receive half of these commissions. I remember that the subject of commissions was brought to the attention of the directors at the June meeting. We had a good many informal meetings. Some reference was made to it at the June meeting, but I think Mr. J. F. Wysor suggested that it was not necessary to put it in the minutes. Afterwards, in the course of this litigation, some innuendos or insinuations were made about the impropriety of Mr. Coleman receiving part of these commissions, and at the December 30th (1929) meeting, in order to clear the matter up, and to show that there was no secret about the commissions, and reasons for giving them, I think I dictated the resolution, and it was passed by the board of directors. Further in that connection I will say that the minutes of the directors were read to the stockholders, and, while the minutes of the stockholders of the same date and hour do not show it, the minutes of the directors were approved by the stockholders, and there was no question whatever about it—certainly of the principal stockholders in the corporation and the directors knowing about the arrangement as to commissions."

C. E. Richardson, the secretary-treasurer and general manager of Pulaski Veneer Corporation, who was introduced by the appellants, testified before Commissioner Kegley to the following effect:

"About January, 1929, I was in New York, and Boger asked me if I would pay him five per cent on business he got for Pulaski Veneer Corporation or Virginia Panel Corporation. After we made the contract with Victor or took the first order, I wrote Boger a letter confirming my agreement to pay him the five per cent commission. I do not recall the date of that. * * * The letter was written after the order. The verbal agreement was before.

"Mr. Coleman was in New Jersey with Boger the latter

part of June (1929) for a period of a week or ten days, and on his return he immediately advised me he had made a deal with Boger whereby he was to get one-half of the commissions. Then the directors met the latter part of June, maybe the 24th. He discussed this openly with the board of directors, and made the statement if they thought there was anything irregular or wrong he would like for them to express themselves at that time. There was not any dissent that I recall. Something was said about making the motion, and one of the directors, I think it was Mr. Wysor, suggested he did not think it was necessary to put that in the minutes."

Later, on December 30, 1929, the directors passed the resolution referred to by Mr. Draper which was put on the minutes. When this resolution was passed two of the directors, E. B. Lange and A. E. Boger were absent. I do not recall whether or not Coleman was present (when the resolution was passed). About thirty days later the resolution of the directors' meeting was read at the stockholders' meeting, but no vote was taken on it, and no mention of it was made in the minutes of the stockholders' meeting.

While T. C. Coleman was and is president of Pulaski Veneer Corporation, he has not received any salary or "any compensation whatever in the company since its organization." Before we made the contract with Boger, which he assigned to B. C. Sales Company, Inc., we were paying as a commission on the sale of our products. "five per cent for panels and ten per cent for veneers."

Coleman made personal efforts in the sale of these panels to Victor Company. He "made the first trip to Camden with us on March 5th, was present during all the negotiations and figuring on March 5th. Then he worked with me * * * the night of March 5th—he and Boger—on prices. He went back * * * and was present during the negotiations on March 6th, and until the deal was closed * * * on the evening of the 6th, and he made several other trips to Victor's during the year (1929)—three or four."

* * * Before the contract was closed the question was raised "as to the financial responsibility of our company to fulfill a contract of that size. Mr. Weiland turned to Coleman and said: 'You will put your companies behind this and guarantee the fulfillment of the contracts, will you not?' And Mr. Coleman said, 'I will.' * * * Mr. Weiland said to Delp, 'That is satisfactory and you write up the order.'"

The letter of May 13, 1929, terminating Boger's connection with the Pulaski Veneer Corporation was written in confirmation of my previous verbal discharge of him. The conversations which culminated in his discharge "began the latter part of April (1930) when Boger had shown me a letter from McCabe Industries of Salamanca, where he had been elected vice-president of the company, which confirmed the verbal information I had received recently that he was soliciting and working for McCabe Industries, which were a competitive industry to us for the reason that Earl Morrison, general manager of Jamestown Panel Company, was receiver in charge of the operations of McCabe Industries. * * * That being true, and on information I had had that Victor would not place business through Boger, I had requested Boger not to solicit Victor or go over there, giving the reasons, which he accepted until May 11th, at which time it appeared Victor was going to place contracts for the year 1930. That day he came in for a showdown, and I verbally discharged him as an employee of Pulaski Veneer Corporation. * * * The discussions between us had extended for over "maybe three weeks" before the final showdown. On this day, "at Camden the question came up as to whether Mr. Boger represented us at Victor. He asked me the direct question, 'Am I or am I not representing you at Victor's?' I said, 'You are not representing us at Victor's,' and he said, 'I will go down and advise Donahue about it.' * * * His connection was not severed though over at Philco's at that time." * * * I felt it necessary to tell Boger this because "I had been told by Mr. Weiland

and Mr. Keifer that Boger was not acceptable to them as a representative at that time." * * * Boger "got a set of specifications on that same day, and Mr. Donahue [of Victor Talking Machine Co.] told me that he was withholding letting the contract until Mr. Boger had time to submit a bid from another company." At that time [May 11th] I was dealing direct with Victor though we had not cancelled our contract with Boger.

Mr. J. F. Wysor, one of the directors of Pulaski Veneer Corporation testified to the following effect:

I do not recall definitely when I first learned that Coleman was interested in Boger's commission contract. "I knew right in the beginning * * * that Boger was to get commissions of five per cent. Later on * * * Mr. Richardson or Mr. Draper told me Coleman had an interest in the commissions, and then Mr. Coleman told me, but just when that was I could not say—it was just prior to June 20th. It could not have been very long before that, because the whole matter had not taken up more than sixty days." * * * "At the time the contract [of June 20th] was drawn I do not know that the directors knew it. I knew it, and had some conversation with him [Coleman] about it. Later the matter was discussed by the entire board, or other directors, some six or eight. There are ten directors of Pulaski Veneer Corporation." * * * "Mr. Coleman made no secret of the fact that he was interested in this matter." * * * "I do not know that any directors' meeting was held" at the time the contract of June 20th was entered into. "So far as the board of directors passing on this, I don't think they did until subsequently the whole matter came up with reference to the fact that Mr. Coleman was participating in these commissions, and there were some minutes passed at a regular meeting of the directors in regard to it. * * * There was a right frank discussion of it. It was thoroughly gone into."

I am responsible for the changes in the contract providing for cancellation on thirty days notice and the clause providing that Boger was to personally perform

all the services which he agreed to perform under that contract. Boger demurred very much to the provision for cancellation, and "did not want to sign that contract. He said we would cut him out any time after all his work; that we could arbitrarily get rid of him. It was pointed out to him that we could only do that on his failure to render the personal service required by the contract. We finally convinced him tha he was protected to that extent, and he agreed to it. * * * We probably talked it over more than once, but I was present when he signed it." * * * "It was signed and assigned at the same time, I think."

Coleman testified in his own behalf before Commissioner Kegley. It is not necessary to set forth all of the testimony but his testimony with reference to Boger's discharge by the Pulaski Veneer Corporation and with reference to Boger's claim that Coleman had assured him, as a consideration for his assignment of the contract of June 20, 1929, to B. C. Sales Company, Inc., that his contract with the Pulaski Veneer Corporation would be perpetuated, is as follows:.

"Q. When was the first time you had any intimation that Boger was not acceptable to the Victor Company?

"A. I think it was some time in the first part of 1930.

"Q. Start there and tell the facts leading up to the severing of the connections between Pulaski Veneer Corporation and B. C. Sales Company and Boger.

"A. It seemed like he had a break with Mr. Keifer and Mr. Weiland, vice-president in charge [of the Victor Talking Machine Company]. They said they did not want at that time to have any more dealings with Mr. Boger.

"Q. Do you recall when Boger's services were dispensed with—the date?

"A. Some time early in May, 1930, Mr. Richardson went up there and had a talk with Mr. Boger and severed the connection.

"D. Q. 1. You have heard the testimony of Mr. Boger as to assurances given by you that his contract would not be terminated. I wish you would state whether you

made any such assurances, and if anything was said, and what was said?

"A. The only thing said between us on that was Mr. Boger was talking to me after the contract was signed, and seemed to be very much disturbed about the thirty-day clause. I told him I did not think it was necessary for him to be disturbed over it, that the Veneer Company certainly would not get rid of his services or terminate his contract so long as they were able to get orders, but if they failed to get orders, the contract would not be any good to him any way.

"D. Q. 2. Did you make any assurances to him that the contract would be perpetuated?

"A. That was all that was said.

"D. Q. 3. You did not make any assurances that the contract would be perpetuated?

"A. No, sir.

"D. Q. 4. Mr. Coleman, did you discharge Mr. Boger and if you did not, who did?

"A. Mr. Richardson discharged him from Camden. Then he called me up. * * * Mr. Richardson said it seemed like he was not acceptable to Victor Company, and he thought we ought to sever that contract. I said, 'You are manager, and if you think you should sever that contract, it will be all right, and go ahead.' He went up there and had the talk and called me up over the phone and told me what had been said, and I said 'that is perfectly satisfactory to me.'"

In reply to the question: Have you talked to Boger about those judgments and why he confessed those judgments? Coleman answered: "Yes, he came in my office I think some time the first of this year, and I asked him why he did it when he had always denied them. He said Mr. Gilmer came to Washington to meet him, and told him that it was the only way he could get any money out of the balance down here, or keep me from getting any money, was for him to confess those judgments. He said he was mad because of being fired, and he was willing

to do almost anything in order to keep me from getting my part of the money." Though Boger testified after Coleman had testified, he was not examined as to whether he made this statement and it stands undenied.

The resolution passed by the board of directors of Pulaski Veneer Corporation on December 30, 1929, reads as follows:

"Be it further resolved, That whereas, it appears to the board that said commissions of five per cent on contract with the Victor Talking Machine Company and others, are usual and customary commissions, and it further appearing in view of the fact that T. C. Coleman has exerted his personal effort in securing said contracts and the fulfillment of the same, and that said commissions are not excessive and would necessarily have to be paid to the B. & C. Sales Corporation, that the board fully recognizes the right and propriety of said T. C. Coleman in receiving said part of said commissions from said B. & C. Sales Corporation notwithstanding his being connected with and president of this corporation, it being recognized by the board that there was no improper conduct on the part of T. C. Coleman in receiving said commissions, and that the interest of this corporation has not been in the least involved or jeopardized by T. C. Coleman being a stockholder in the B. & C. Sales Corporation."

The first ground on which Boger contends that the agreement between Coleman and himself, and the assignment in pursuance thereof of his contract of June 20, 1929, to the B. C. Sales Company, Inc., are void or voidable by him, is predicated upon the fact that Coleman was the president and a director of the Pulaski Veneer Corporation, and was one of the officers of that corporation who executed for the corporation the contract of June 20, 1929. This ground he urges in a double aspect.

(1) He contends that the agreement and assignment are void or voidable by him because they constituted a secret arrangement made by Coleman to permit him to participate in the profits of Boger's contracts with

the Pulaski Veneer Corporation without the corporation or the others interested therein knowing of his participation. As was rported by Commissioner Kegley this contention is not sustained by the evidence. It shows that Coleman's agreement with Boger that he should share in the profits of these commission contracts and the fact that he was interested in the B. C. Sales Company, Inc., to which the contract of June 20, 1929, was assigned, were not kept secret and that no attempt was made to keep them secret.

■ (2) He contends that the agreement and assignment are void or voidable by him because they were made without the consent of *all* the stockholders of the Pulaski Veneer Corporation. More fully stated his contention is this: A director or officer of a corporation may not, directly or indirectly, secretly or openly, obtain profits from a contract made by the corporation with a third party, unless the agreement or arrangement with the third party by which he obtains such profits is made with the consent of *all* the stockholders of the corporation, given *before* the agreement or arrangement between him and the third party was made. If an officer or director makes an agreement, or arrangement, by which he is to obtain profits from a contract between the corporation and a third party without the consent of all the stockholders so given, it is illegal, even though the officer or director may have acted in good faith, have made the contract with the knowledge and/or consent of the other directors, and the corporation may have received no detriment from it; and for reasons of public policy the law will not permit him to recover against the third party on such contract, although neither the corporation or any stockholder thereof is complaining.·

Most of the cases cited by Boger in support of this contention are cases dealing with the right of a corporation to recover from its officer or director profits obtained by him under a contract made by a third party with it, with which question we are not here concerned. The cases

cited by him which were actions or suits brought by an officer or director to enforce a contract made between himself and a third party are those cited in 3 Cook on Corp. section 650, note 1. They do not sustain the broad proposition of law asserted by him. They are all cases in which the contract with the officer or director was in the nature of a gift, gratuity, or bribe to him to influence his official action, or constituted the perpetration of or attempt to perpetrate an actual fraud upon the corporation.

In this last mentioned class of cases the courts, for reasons of public policy, refuse to enforce at the suit of an officer or director a contract between him and a third party under which he participates in the profits of a contract between the third party and the corporation, even though there are no equities in favor of the third party and neither the corporation nor any stockholder is objecting to it. This holding of the courts is based upon the same principles applied by this court in *Williams* v. *Kendrick,* 105 Va. 791, 54 S. E. 865. But ordinarily, in the absence of proof of actual bad faith toward the corporation on the part of the officer or director, a contract between him and a third party by which he participates in the profits of a contract between the third party and the corporation is not *per se* void or voidable as between him and the third party. Generally any equities which arise from such a situation are equities in favor of the corporation or its stockholders and not of the third party. Corpus Juris, volume 14A, pp. 120-124, and cases there cited. The third party may rest his defense, if any he has, upon the policy of the law not to lend itself to aid a party to reap the benefit of his corrupt or fraudulent conduct. To avoid his liability under such a contract between himself and an officer or director of a corporation, it is not sufficient for the third party to show that the corporation is entitled to recover from the officer or dircetor any profits he may receive under the contract. He must go further and prove that in making the contract the officer or di-

rector was guilty of moral turpitude or actual bad faith towards the corporation.

In the instant case the evidence is insufficient to show that Coleman has been guilty of any moral turpitude or bad faith towards the Pulaski Veneer Corporation; and, whatever may be the rights of Pulaski Veneer Corporation as against Coleman for profits obtained by him under the agreement and assignment here in question, they are not void or voidable by Boger on the ground that Coleman was the president and a director of Pulaski Veneer Corporation.

The second ground on which Boger contends that the agreement between Coleman and himself and the assignment made to B. C. Sales Company, Inc., in pursuance thereof is unenforceable by Coleman is that there was no consideration for either of them.

Boger's agreement with Coleman was, in effect, that the contract which he (Boger) had with Pulaski Veneer Corporation should be treated as a part of the business of the partnership which he and Coleman had formed in January, 1929, which had been formed originally for the sale of radio cabinets. While Boger was in the prosecution of the partnership business, and in the act of attempting to sell radio cabinets to the Victor Talking Machine Company, he found that he could not sell it complete cabinets but probably could sell it panels and veneers for radio cabinets. Upon making this discovery he procured a contract from Pulaski Veneer Corporation to pay him a commission on panels and veneers for radio cabinets sold the Victor Company. The sale of panels and veneers for the manufacture of cabinets was a business which was, to some extent, competitive with the sale of finished cabinets, and it took Boger's time and attention from the prosecution of the partnership business. Coleman's consent to his partner's devoting his time and attention, or a part of it, to this semi-competitive business was a sufficient consideration for Boger's agreement to treat his contract with the Pulaski Veneer Corporation as

a part of the partnership business. It was mutually agreed between the partners that the B. C. Sales Company, Inc., should be incorporated and the business of the partnership transferred to it. B. C. Sales Company, Inc., was incorporated and the assignment of the contract of June 20, 1929, made to it in pursuance of this agreement. This was a sufficient consideration for the assignment.

■ The third ground upon which Boger contends that the assignment of the contract of June 20, 1929, is void is that the consideration for the assignment was a promise to him by Coleman that he would see that the contract was perpetuated, and that this promise was (1) a breach of trust on Coleman's part towards the corporation of which he was president, and (2) not kept by Coleman.

The weight of the evidence is that Coleman did not make any such promise to Boger. Boger's own testimony shows that he had agreed with Coleman that his contract with the Pulaski Veneer Corporation should be treated as a part of the partnership business some time before he claims that Coleman made him this promise. Further he testified that this promise was made to him on the train the night after the contract of June 20, 1929, had been signed. Mr. Wysor's testimony, which is not contradicted, is that the contract was signed and assigned at the same time, which fixes the time at which Boger claims this promise was made to him as being after the contract had been assigned. The promise, if made, could not have been made as a consideration for the assignment.

Further, so far as the termination of Boger's contract is concerned, the evidence clearly shows a state of facts such that, if Coleman had undertaken to keep it in force, he would have been acting in bad faith towards the Pulaski Veneer Corporation.

■ The fact that Coleman was the president and a director of Pulaski Veneer Corporation probably was a consideration which worked in Boger's mind as an inducement to him to continue the partnership with Cole-

man and put his contract with Pulaski Veneer Corporation into the partnership business, instead of terminating the partnership and going it alone, when he found that he could sell the products of the Pulaski Veneer Corporation to the Victor Company. But there is no evidence which tends to show that Coleman did anything which could be considered as using his relationship with the Pulaski Veneer Corporation to coerce Boger to put his contract with Pulaski Veneer Corporation into the partnership business. On the contrary, when all the evidence is considered, we think that it makes it plain that Boger acted of his own free will in this matter and that his suggestion of duress or coercion is an afterthought, born long after he had assigned the contract of June 20th to B. C. Sales Company, Inc.

The contention of Boger that the proceeds received from his contract with Pulaski Veneer Corporation were capital contributed by him to a partnership composed of Coleman and himself is chimerical. They do not bear a single earmark of capital contributed to either a partnership or a corporation.

We are of opinion that Commissioner Kegley correctly reported and the court correctly decreed that, as between Boger on the one side and Coleman and B. C. Sales Company, Inc., on the other, the agreements between Coleman and Boger and the assignment by Boger to B. C. Sales Company, Inc., are valid and enforceable.

John W. Deeds, receiver of B. C. Sales Company, Inc., Pulaski Veneer Corporation and T. C. Coleman, to whom we shall refer to as the appellants, make only three formal assignments of error, which they state in their petition as follows:

"(A) The court erred in granting the original injunction and in continuing it in force from time to time.

"(B) The court erred in overruling the demurrers interposed to the original supplemental and amended bills and the petitions for attachments.

"(C) The court erred in directing the payment of $7,000

to J. L. Wysor, attorney for the plaintiffs, in the confession of judgments."

But in their treatment of their formal assignments they in effect make a fourth assignment of error, which may be designated D and stated thus:

(D) The court erred in decreeing that, as between himself and B. C. Sales Company, Inc., and as between himself and Coleman, Boger is entitled to one-half of the fund in the hands of the court after the payment of taxable costs and expenses connected with this cause, and that Coleman is entitled only to the other half.

If there is no error in that part of the decree of the court which decrees that, as between themselves, Coleman and Boger are each entitled to one-half of the fund in the hands of the court, the appellants cannot complain of the errors assigned in their three formal assignments of error, because, even if it be admitted that the court erred in these particulars, they have not been injured thereby. We shall, therefore, take up and dispose of this question before going further.

The court plainly erred in decreeing that Coleman and Boger are each entitled as between themselves to one-half of the fund in the hands of the court. This part of the decree cannot be sustained upon any theory of this case, unless at least all of the $17,772.93, which the statement of the Pulaski Veneer Corporation shows was paid to B. C. Sales Company, Inc., after June 20, 1929, was used by Boger for the payment of the legitimate expenses of the business of B. C. Sales Company, Inc.; and the evidence does not sustain a finding that this is so.

Boger testified that all the sums ($30,167.99) paid by Pulaski Veneer Corporation on account of commissions accrued on his contracts with it were ultimately received by him, that Coleman received no part of them, and that he (Boger) was keeping the accounts or having them kept in New York; and Coleman testified that he left the keeping of the accounts wholly to Boger. While Boger testifies that he paid the expenses of the business out of the

sums paid by Pulaski Veneer Corporation, he nowhere testifies or intimates that all the amounts paid by Pulaski Veneer Corporation were applied to the payment of expenses; and it is impossible to read his testimony and not understand that he admits that parts of the sums paid by it were used by him for his own use. Further, C. E. Richardson testified that one of the reasons that the Pulaski Veneer Corporation made the payments which were made after July 11, 1929, was this: "Boger claimed it was necessary that he have considerable money to take care of living expenses in New York. He said he maintained a nice home there, and had to entertain at Camden, and in general that he had to spend considerable money to keep things moving."

The keeping of the accounts having been left entirely to Boger, as between him on the one side and Coleman and B. C. Sales Company, Inc., on the other, the burden rested upon Boger to show what part of these funds were properly used for the expenses of the business, and is personally chargeable with all that he does not show were so used.

The statement of payments filed by Pulaski Veneer Corporation is the only evidence which tends to point out any specific items of expense that were paid either by Boger or out of the sums paid by it. In this statement the following items show some earmark of having gone for the payment of expenses of the business in which Coleman and Boger were jointly interested—an item of $19.34 paid prior to June 20, 1929, items aggregating $334.28 which were paid between June 20 and July 11, 1929, and items aggregating $1,117.20 which were paid after November 4, 1929. In addition to this the statement shows that on November 23, 1929, two items of $500 each were paid by Pulaski Veneer Corporation to J. S. Draper and charged to the account of B. C. Sales Company, Inc.; and the record shows that at that time J. S. Draper was counsel for Boger, Coleman and B. C. Sales Company, Inc. It is not clear that all these items were for the ex-

penses of the business; but if they are all considered as having been paid for the expenses of the business, the total which is identified as having gone for the payment of expenses amounts to only $2,491.21. This leaves unexplained the purpose for which at least $15,262.38 of the $17,772.93 paid by Pulaski Veneer Corporation after June 20, 1929, was used.

A consideration of the whole evidence would seem to show that these sums do not represent all the expenses paid by Boger from these moneys. But even so, as is stated in the report of Commissioner Kegley, the evidence is not sufficient to warrant a decree predicated upon a finding that all the sums listed by Pulaski Veneer Corporation as having been paid to B. C. Sales Company, Inc., went to the payment of the expenses of the business.

Before taking up specificaly the other assignments of error made by the appellants there are several propositions of law, or of law and fact, which should be adverted to.

When causes are consolidated, the several suits or proceedings do not become one suit. "The parties * * * in one suit do not become parties to the other, and their rights still depend or turn on the pleadings, proof, and proceedings in the respective causes. The issues remain precisely as they were, and are to be determined exactly as if the cases had been heard separately. In short, the consolidation (in equity) merely operates to carry on together two separate suits supposed to involve identical issues, and is intended to expedite the hearing and diminish the expense." *Atkinson* v. *Solenberger,* 112 Va. 667, 670, 72 S. E. 727, 728, and authorities therein cited; Fletcher Eq. Pl. & Pr., section 455.

B. C. Sales Company, Inc., became technically a corporate entity; and as such was capable of contracting and being contracted with, of taking and holding the assignment of Boger's contract with Pulaski Veneer Corporation, and of suing and being sued. But the evidence shows beyond all question that Boger and Coleman have

been at all times the beneficial owners in equal parts of all its capital stock and/or of all rights to subscribe therefor; and that they have consistently, utterly disregarded its corporate entity, and dealt with its rights, property and business as if they belonged to a partnership composed of themselves. In view of this, as between themselves and as between one of them and the creditors of the other, they should not be heard to say that (except for the purpose of suing and being sued in its corporate name) it is other than a partnership composed of themselves doing business under the name and style of B. C. Sales Company, Inc. The trial court seems, in effect, to have thus considered it and dealt with it. We think it was correct in doing so; and for all the purposes of this cause we shall so treat it and deal with it and its property.

Where a codefendant in an attachment is named as a person who is indebted to or has in his possession property belonging to the principal defendant, by the service of a copy of the attachment upon the codefendant the plaintiff acquires an inchoate lien upon any debt *then* owed to the principal defendant by the codefendant, and upon any property of the principal defendant *then* in the possession of the codefendant. But he acquires no lien whatever upon any indebtedness of the codefendant to the principal defendant which accrues after the service of the attachment, or upon any property of the principal defendant which comes into the possession of the codefendant after the service of the attachment upon him. Sections 6390, 6393 and 6398, Code Va. 1919; *Farmers' Bank* v. *Day,* 6 Gratt. (47 Va.) 360; *Haffey* v. *Miller,* 6 Gratt. (47 Va.) 454; *B. & O. Ry. Co.* v. *Gallahue's Adm'rs,* 12 Gratt. (53 Va.) 655, 65 Am. Dec. 254; *Trimble* v. *Covington Grocery Co.,* 112 Va. 826, 72 S. E. 724.

By the service on September 6, 1929, of copies of his attachment on Pulaski Veneer Corporation, B. C. Sales Company, Inc., and T. C. Coleman, W. F. White acquired an inchoate lien on all sums *at that time* owed by Pulaski Veneer Corporation to B. C. Sales Company, Inc., which

would have been payable to Boger upon a settlement as of that date of the partnership affairs between Boger and Coleman, but upon nothing more.

When W. F. White, D. A. Smith, receiver of Rocky Gap Flooring Company, and Pulaski National Bank served copies of their attachments against Boger on Pulaski Veneer Corporation on October 12th, and on B. C. Sales Company, Inc., and T. C. Coleman on October 14, 1929, they severally acquired inchoate liens on all sums *then* owed by Pulaski Veneer Corporation to B. C. Sales Company, Inc., which would have been payable to Boger upon a settlement as of October 12, 1929, of the partnership affairs between Boger and Coleman, but upon nothing more.

Likewise, when H. C. Gilmer, receiver of Fireproof Wood Products Corporation, served a copy of his attachment against Boger on B. C. Sales Company, Inc., and T. C. Coleman on November 2, 1929, and on Pulaski Veneer Corporation on November 4, 1929, he acquired an inchoate lien on all sums *then* owed by Pulaski Veneer Corporation to B. C. Sales Company, Inc., which would have been payable to Boger upon a settlement as of November 2, 1929, between Boger and Coleman of the partnership affairs, but upon nothing more.

For reasons which will hereafter appear, we are of opinion that none of the parties who are here asserting claims against Boger acquired any lien upon or right to any part of the fund in the hands of the court, or any right against Pulaski Veneer Corporation, B. C. Sales Company, Inc., or T. C. Coleman by reason of the injunction granted in this cause; and that as between themselves the rights and obligations of all the parties to this cause are to be determined as if no injunction had been granted.

An injunction is granted to protect or enforce existing rights or liens. It does not create any new lien or give rise to any new substantive rights between the person to whom it is granted and the persons enjoined. The only right of recovery which a party to a cause can ac-

quire under and by virtue of an injunction granted to him therein is such as he may receive through the medium of a remedial punishment imposed by the court upon a violator of the injunction in a proceeding for civil contempt.

Though an injunction may have been erroneously granted, unless it is absolutely void, it is the duty of the parties enjoined to obey it scrupulously, and they will be held to a strict observance of it. If they violate the order themselves, or assist or encourage others to violate it, they may be punished by the court for their contempt. But the exercise of the power of the court to punish a violator of its injunction for his contempt has a double aspect. (1) It may always punish the violator for the purpose of upholding and vindicating the authority and dignity of the court. (2) In appropriate cases it may punish the violator for the purpose of preserving and enforcing the rights and administering the remedies to which the court has found the persons for whose protection the injunction was granted to be entitled.

Where the proceeding is for the first purpose it is commonly spoken of as a proceeding for criminal contempt. Where it is for the second purpose, it is commonly spoken of as a proceeding for civil contempt. If the injunction order is not absolutely void, but is merely erroneous, the error of the court in granting it has little, if any, bearing in a proceeding for criminal contempt, except upon the question of the degree of the punishment which should be imposed. But it may have a very material bearing in a proceeding for civil contempt. Another important difference between the two classes of proceedings is that what may be sufficient to warrant the court in not imposing a punishment in a proceeding for criminal contempt may not be sufficient to relieve the violator from remedial punishment in a proceeding for civil contempt.

A proceeding for criminal contempt is a *quasi* criminal proceeding between the public and the violator. It is not properly a part of the injunction suit, and the

parties in whose favor the injunction was granted are not properly parties to the proceeding, though it may have been instigated at their instance. In contempt proceedings of this nature the punishment imposed is a fine and/or imprisonment. *Bessette* v. *W. B. Conkey Co.*, 194 U. S. 324, 24 S. Ct. 665, 48 L. Ed. 997; *Gompers* v. *Buck's Stove & Range Co.*, 221 U. S. 418, 31 S. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874, and note; *State* v. *Harness*, 42 W. Va. 414, 26 S. E. 270; *Kidd* v. *Virginia Safe Deposit & Trust Corp.*, 113 Va. 612, 75 S. E. 145.

A proceeding for civil contempt partakes more of the nature of a remedial civil proceeding than it does of the nature of a criminal proceeding. Its main purpose is to procure the imposition of a punishment which will afford remedial relief to the parties injured by the violation of the injunction. Not only is the proceeding instituted at the instance of the injured parties, but they are parties to it; and it is properly instituted and tried as a part of the injunction suit. In contempt proceedings of this nature the punishment which may be imposed is not limited to a fine and/or imprisonment. It is adapted to what is necessary to afford the injured party remedial relief for the injury or damage done by the violation of the injunction to his property or rights which were under the protection of the injunction. In appropriate cases the violator may be punished by forcing him to restore the *status quo* as it existed before the violation, or by adjudicating against him as if that *status quo* had not been interrupted, or by an award of damages against him in favor of the injured party sufficient to indemnify him for the pecuniary loss occasioned to him as a result of the act or omission which violated the injunction having injured or damaged property or rights which he was entitled to have protected or preserved by the injunction. But it is to be borne in mind that an injunction gives rise to no lien or new substantive right, and that it only protects existing rights and liens which are pleaded in the suit in which it is granted. If the violation of the injunc-

tion has not damaged any property or rights or prevented the enforcement of a lien which, under the pleadings and proof in the injunction cause, the complainant was legally entitled to have protected, preserved, or enforced by the injunction, he has not been damaged by its violation, and is not entitled to have remedial punishment imposed upon the violator. To state the last proposition in a different way—where, upon a hearing of the cause, it appears that the injunction should never have been granted to the person complaining of its violation, because, under pleadings and proof in the injunction cause he was not entitled to have injunctive relief, he has not been injured or damaged by the violation thereof, and is not entitled to have remedial punishment imposed upon the violator; and in such cases the court will not impose upon the violator a remedial punishment. This, however, does not affect the liability of the violator to punishment for criminal contempt. 32 C. J. (Injunctions) sections 888-890; 2 High on Injunctions (4th Ed.) section 1440b; *Bessette* v. *W. B. Conkey Co., supra; Gompers* v. *Buck's Stove & Range Co., supra;* note 13 L. R. A. (N. S.) 591, entitled "Is prosecution for contempt for violation of an injunction civil or criminal;" *Griggs* v. *Doctor,* 89 Wis. 161, 61 N. W. 761, 30 L. R. A. 360, 46 Am. St. Rep. 824; *Webster* v. *Douglas County,* 102 Wis. 181, 77 N. W. 885, 78 N. W. 451, 72 Am. St. Rep. 870; *Main* v. *Field,* 13 Ind. App. 401, 40 N. E. 1103, 41 N. E. 829; *Teager* v. *Landsley,* 69 Iowa 725, 27 N. W. 739; *Board of Trade of City of Chicago* v. *Tucker* (D. C.) 221 F. 300; *Northland Rubber Co., Inc.* v. *International Automobile League* (Sup.) 143 N. Y. S. 9; *O'Brien* v. *People ex rel. Kellogg Switchboard & Supply Co.,* 216 Ill. 354, 75 N. E. 108, 108 Am. St. Rep. 219, 3 Ann. Cas. 966; *People ex rel. Wm. J. Gaynor* v. *McKane,* 78 Hun (N. Y.) 154, 28 N. Y. S. 981; *People* v. *Diedrich,* 141 Ill. 665, 30 N. E. 1038.

In considering assignment of error A (that the court erred in granting the injunction and in continuing it in force from time to time) it is profitless to consider the

bare question of whether the court committed error in granting and continuing the injunction. Whatever effect the injunction may have upon the rights of any of the parties to the appeal depends upon his right to have the court impose in his favor a remedial punishment upon the violators of the injunction; and it is only in this aspect that assignment of error A is pertinent.

Under the pleadings and proof in this consolidated cause, none of the parties thereto are entitled to complain in a proceeding for civil contempt of the violation of the injunction here in question, or to have the court impose upon those who violated it remedial punishment in his favor by reflecting such punishment in the decree entered against him. This is tantamount to saying that the rights of the several parties are to be determined just as if no injunction had been granted.

Pulaski National Bank was never at any time in any way a party to the injunction suit. It was not a party to the injunction bill; it filed no petition in that suit; and the consolidation of its attachment proceeding with the injunction suit did not operate to make it a party to that suit. Clearly its rights must be determined as if the injunction bill had not been filed.

The injunction bill filed July 11, 1929, and the "supplemental and amended bill" filed October 1, 1929, are peculiar pleadings.

The injunction bill was filed primarily by H. C. Gilmer in his official capacity as receiver of Fireproof Wood Products Corporation, though the eight other parties whose names are signed thereto joined therein as parties complainant. Yet it does not allege, or purport to allege that Fireproof Wood Products Corporation or H. C. Gilmer as its receiver has any claim, demand, or cause of action against Boger.

The "supplemental and amended bill" was filed solely by H. C. Gilmer in his official capacity as receiver of Fireproof Wood Products Corporation. But it does not allege or purport to allege that Fireproof Wood Products Cor-

poration or H. C. Gilmer, as its receiver, has any claim, demand, or cause of action against Boger, nor does it make any person or corporation who is asserting a claim against Boger a party complainant. or defendant to it.

It is difficult to account for or understand these two pleadings except upon one theory. That is, that H. C. Gilmer was proceeding upon the mistaken theory that, by virtue of the language which we have italicized in quoting the decree of July 5, 1929, appointing him receiver of the Fireproof Corporation, he was authorized and empowered to institute and prosecute in his official capacity as receiver of that corporation, a suit in equity to enforce for the several individual creditors of that corporation any claims which they might have against Boger personally for damages which they claimed to have suffered by reason of his having induced them by fraudulent misrepresentations to grant credit to that corporation.

Whatever may have been the intention of the draftsman of that decree, it is not, we think, properly to be construed as having given him, in his official capacity as receiver of Fireproof Wood Products Corporation, any such authority. Such authority is wholly foreign to the purposes for which a receiver may be appointed, and the decree must be construed in the light of that fact.

On the same day (October 1st) that he filed his "supplemental and amended bill," H. C. Gilmer, as receiver for Fireproof Wood Products Corporation, filed on the law side of the court a petition for an attachment in which he alleges a cause of action against Boger. But no reference is made to this petition in the supplemental and amended bill; and the subsequent consolidation of that proceeding with the injunction suit did not have the effect of amending either the injunction bill or the supplemental and amended bill so as to insert therein the allegation of a cause of action against Boger in favor of Fireproof Wood Products Corporation or H. C. Gilmer as its receiver or make the petition for attachment a petition filed in the injunction suit.

In the injunction bill H. C. Gilmer, receiver of Fireproof Wood Products Corporation, alleges with some particularity that Boger is personally liable to H. C. Gilmer, receiver of Cheves Lumber Company, for fraud and deceit practiced upon him in his capacity as receiver of Cheves Lumber Company, prays for the enforcement of that liability and for an injunction in aid of the enforcement thereof, and that the injunction suit may be consolidated with the suit theretofore brought by H. C. Gilmer, receiver for Cheves Lumber Company. But though H. C. Gilmer in his official capacity as receiver for Fireproof Wood Products·Corporation is as distinct from H. C. Gilmer in his capacity as receiver for Cheves Lumber Company as H. C. Gilmer as an individual is from Boger, yet H. C. Gilmer as receiver for Cheves Lumber Company has not made himself a party complainant, or been made a party defendant to either the injunction bill or the "supplemental and amended bill." Nor did the consolidation of the injunction suit with a suit to which H. C. Gilmer as receiver of Cheves Lumber Company was a party make him a party in that capacity to the injunction suit.

The result is that H. C. Gilmer in his official capacity as receiver of Fireproof Wood Products Corporation has stated no cause of action against Boger which entitled him to any of the relief prayed for in either the injunction bill or the supplemental and amended bill; and H. C. Gilmer in his official capacity as receiver of Cheves Lumber Company has not become a party to the injunction suit, and is not entitled to any of the relief prayed for in the bill, or to the protection of the injunction therein granted.

James McGraw, Inc., Standard Oil Co., Virginia Hardwood Lumber Co., Inc., Midland Valley Lumber Co., Inc., Pulaski Engineering Works and F. L. Quesenberry joined as complainants in the injunction bill; but the bill neither alleges nor purports to allege that any of them have any individual right, claim, demand or cause of action against Boger on any account whatever. The alle-

gation of the bill is that they are creditors of Fireproof Wood Products Corporation. The only intimation that these complainants may claim to have personal claims of any kind against Boger is that they join in the prayers for relief, including the prayer that "your petitioners may have applied to their several debts all moneys due or to become due to said A. E. Boger and to B. C. Sales Corporation [by Pulaski Veneer Corporation] to and including the return and hearing day of said attachments" sued out by W. F. White and D. A. Smith. This is wholly insufficient to constitute an allegation that they have personal causes of action against Boger. These six parties are clearly not entitled to claim the protection of the injunction for any individual claims they may have against Boger.

It may be here noted that the judgments which Boger subsequently confessed in favor of these parties do not profess to have been confessed in this injunction suit. They are entered as having been confessed in an action of assumpsit. But if it be assumed that they were intended to be confessed in the injunction suit, they cannot operate to insert in the injunction bill allegations of individual causes of action in favor of these parties against Boger as distinguished from the right to share as creditors of Fireproof Wood Products Corporation in any collections which may be made from Boger on account of sums owed by him to that corporation. We are not here dealing with a bill which states imperfectly individual causes of action which these parties claim to have against Boger; but a bill which contains no allegation that Boger is liable to them individually on any account.

As to W. F. White and D. A. Smith the situation is somewhat different. By allegations therein made and the reference therein to the attachments sued out by them, the injunction bill alleges that White and Smith each claim that Boger is personally liable to them for damages resulting to him from Boger having induced him by fraudulent misrepresentations to grant credit to Fire-

proof Wood Products Corporation, that such liability arose prior to Boger's assignment of his contract to B. C. Sales Company, Inc., that he has sued out an attachment on his claim in which Pulaski Veneer Corporation is named as codefendant, and as being indebted to Boger, and that a copy of this attachment has been served on Pulaski Veneer Corporation. But the difficulty here is this. The attachment proceeding instituted by White on July 3rd was never served upon Boger, and when on September 6th it was dismissed as to all the codefendants, White abandoned all proceedings on that attachment; and Smith later dismissed his petition for attachment against Boger which was filed on July 3rd.

It is true that on September 6, 1929, White filed a new petition for attachment against Boger and on October 10th an amended petition for attachment against him, and that Smith filed a new petition for attachment against Boger on October 10th. But neither these petitions nor the attachments issued thereon were ever pleaded by them in the injunction suit; and the subsequent consolidation of these attachment proceedings with the injunction suit did not operate to amend, enlarge or change the pleadings in the injunction suit.

For the reasons above mentioned, under the pleadings in the injunction suit none of the parties who are here asserting claims against Boger were entitled to the injunctive relief prayed for. But even were it true that H. C. Gilmer, receiver of Cheves Lumber Company is a party complainant to the injunction bill, and that all the complainants therein have alleged and proven good causes of action against Boger personally, still none of them is entitled to have any remedial punishment imposed upon the violators of the injunction, because the proof is wholly insufficient to establish the only good ground for the injunctive relief prayed which was alleged in either the injunction bill or the supplemental and amended bill.

None of the complainants in the injunction bill had re-

duced his claim against Boger to judgment and only two, White and Smith, had attachments against Boger. White lost any inchoate lien which he might have had by virtue of his attachment on any funds in the hands of Pulaski Veneer Corporation when the court on September 6th dismissed his attachment as to that corporation and all the other codefendants. Smith lost any inchoate lien he might have had by virtue of his attachment of July 3rd when he dismissed his petition for an attachment. This being true, there is only one ground upon which any of the complainants can sustain his right to the injunctive relief prayed. It is that the injunction bill was primarily a bill brought under sections 5184-5186, Code Va. 1919, to set aside the assignment, which Boger had made to B. C. Sales Company, Inc., of his contract with Pulaski Veneer Corporation, on the ground that the assignment was made by Boger with intent to delay, hinder, or defraud his creditors; that upon the filing of their bill the complainants became entitled under section 5186, to inchoate liens on the commissions which had accrued and should thereafter accrue under that contract; and that any payments made to B. C. Sales Company, Inc., by Pulaski Veneer Corporation on account of such commissions would be in furtherance of the consummation of the fraud Boger had attempted to perpetrate on them by that assignment, and a violation of their liens. See High on Injunctions (4th Ed.) sections 4103-4105, also section 1350 and page 22.

The allegations of facts which show that the assignment was made with intent to delay, hinder or defraud Boger's creditors are far from satisfactory; and it is only by implication that the bill can be said to pray that the assignment be set aside on that or any other ground. But under the decisions of this court in *American Net & Twine Co.* v *Mayo,* 97 Va. 182, 33 S. E. 523, and *Flook* v. *Armentrout's Adm'r,* 100 Va. 638, 42 S. E. 686, as against a demurrer, it is sufficient for that purpose. However, the bill sets out few facts which go to show the basis for the allegation that the assignment was made with such in-

tent; and the allegations in support of the prayer for discovery tend to show that the complainants did not know facts sufficient to support their allegations of fraud and were on a fishing expedition. In view of this, it is very doubtful whether the court should have granted a preliminary injunction on this bill; but in such case, where the question is not raised on appeal until after a violation of the injunction, the doubt should be resolved in favor of the action of the court.

But, however this may be, when we come to examine the proof we find that it is insufficient to sustain a decree adjudging that the B. C. Sales Company, Inc., was formed and/or his contract assigned to it by Boger with intent to delay, hinder, or defraud his creditors, or that the assignment was void for any other reason. On the contrary, as has been said, the evidence shows that the assignment by Boger of his contract to B. C. Sales Company, Inc., was a legitimate transaction made in pursuance of a legitimate business agreement between Coleman and himself. This being true, the equitable rights of every complainant in the injunction bill to the injunction relief prayed wholly failed *ab initio;*[7] and at the time the decree appealed from was entered it had become apparent that the injunction should never have been issued, even if it be assumed that the *prima facie* case made out at the time it was granted warranted the court in granting it.

There is another particular in which the court committed serious error in entering the original injunction order. Even assuming that it should not have required bond of H. C. Gilmer in his official capacity as receiver of Fireproof Wood Products Corporation, it should not have granted an injunction for his protection and also

---

[7]Any inchoate lien which a party may acquire under section 5186 by filing a bill to set aside a conveyance or assignment on the ground that it is void because it was made with intent to delay, hinder or defraud creditors becomes naught *ab initio* if the proof fails to establish the charge. *Quinn-Marshall Co.* v. *Whittaker,* 116 Va. 965, 83 S. E. 398.

for the protection of the other complainants without having required an injunction bond to be given by or on behalf of the others.

Under section 6324, Code Va. 1919, the court has the power to grant an injunction without requiring bond where the person to whom the injunction is granted is a "person from whom, in the opinion of the court or judge awarding the same, it may be improper to require bond." But it is a very exceptional case in which a court can, without abusing its discretion, grant an injuntion to a person (other than a personal representative or some other person suing in a similar representative capacity) without requiring bond; and there is nothing in this record to warrant the court in having done so.

In the instant case the injunction was granted at the joint suit of a receiver of the court suing in his official capacity and of other parties suing in their individual capacities to enforce demands with which the receiver had no official concern; and it was granted to all the complainants and for the purpose of protecting the several interests of them all. The other complainants were not entitled to have the benefit of the injunctive protection for their individual claims without giving bond, merely because the receiver may have been. This was especially true in this case, because H. C. Gilmer, receiver of Fireproof Wood Products Corporation was not suing to enforce any claim which he in his official capacity had against Boger, but to enforce the claims of others with which he in his official capacity had no concern. However, this error extended only to the granting of the injunction, as bond was required when the injunction was extended on September 6, 1929, and each time that it was thereafter extended.

Regardless of the validity or invalidity or effect of the judgments confessed by Boger, for the reasons heretofore stated, neither H. C. Gilmer, receiver of Cheves Lumber Company, nor any of the complainants in the injunction bill were entitled, either by virtue of having filed the in-

junction bill or by virtue of the injunction granted, to any further lien upon or any greater rights against the fund in the hands of the court in this cause than he would have been entitled to, if the injunction had not been granted or if the injunction bill had not been filed.

There were seven parties in whose favor Boger confessed judgment who did not file a petition for an attachment. These were H. C. Gilmer, receiver for Cheves Lumber Company, James McGraw, Inc., Standard Oil Co., Virginia Hardwood Lumber Co., Inc., Midland Valley Lumber Co., Inc., Pulaski Engineering Works, and F. L. Quesenberry. The commissioner reported, in effect, that each of these seven judgment claimants had a lien on the fund in the hands of the court which was superior to the rights of Coleman in this fund; and the court by overruling the exceptons of the appellants to the report so held. In this it erred.

Even if it be assumed that the judgments confessed by Boger in their favor are valid in all respects, it follows from what has been said above that none of these seven parties is entitled to have any part of the fund in the hands of the court applied to the payment of his judgment until, treating B. C. Sales Company, Inc., as a partnership, there has been a settlement of its partnership accounts as of May 20, 1930,[8] between Boger and Coleman; and there has been paid to Coleman the full amount to which he is entitled on such settlement.

In considering assignment of error B (that the court erred in overruling the several demurrers) it is not necessary to discuss the demurrers to the injunction bill filed July 11, 1929, and the "supplemental and amended bill" filed October 1, 1929, further than has been done in considering assignment of error A.

[8] No execution was issued on these judgments, and it is not entirely accurate to fix May 20, 1930 (which is the date of the judgments), as the date for this settlement; but in the instant case it appears that a settlement as of this date will produce the correct results; and we have fixed this as the settlement date for convenience.

 The only specific ground of demurrer which is here urged to the bill filed June 5, 1929, and to the several petitions for attachment is that the allegations therein contained are insuffiicent as statements of causes of action in favor of the several plaintiffs against Boger for fraudulent misrepresentations made to them by him. It is useless to discuss the questions raised by this ground of demurrer for the reason that, if it be that the court erred in not sustaining the demurrers on this ground, the judgments confessed by Boger in favor of the complainant in the chancery suit and of the plaintiffs in the attachment proceedings operated as a waiver of the errors.

We come now to a consideration of assignment of error C, which, as stated by the appellants, is that "the court erred in directing the payment of $7,000 to J. L. Wysor, attorney for the plaintiffs in the confession of judgments." But, as more fully developed in the petition for an appeal, this assignment of error is that the court erred in decreeing that the parties in whose favor Boger confessed judgments are entitled to have any part of the funds in the hands of the court applied, either directly or through the medium of J. L. Wysor, to the payment of their judgments; and in not decreeing that the several suits and attachment proceedings be dismissed and the whole fund in the hands of the court be paid "to your petitioners." This assignment of error is based in part upon considerations with which we have heretofore dealt, to which we shall not again advert. Particularly is this true with reference to the rights of the seven parties who did not sue out atachments. But in its broader scope it is based upon the contentions made by the appellants with reference to the validity and/or effect of the judgments confessed by Boger.

The first contention made under this heading is that none of the judgments were confessed in any of the suits or attachment proceedings which compose this consolidated cause; and that, therefore, in these causes the rights

of the parties are to be determined as if they had not been confessed.

This contention is not well made with reference to the judgments confessed in favor of H. C. Gilmer, receiver for Cheves Lumber Company, and the four parties who sued out attachments, W. F. White, D. A. Smith, receiver of Rocky Gap Flooring Co., Pulaski National Bank, and H. C. Gilmer, receiver of Fireproof Wood Products Corporation.

The power of attorney expressly authorizes Wysor to confess judgments in favor of these parties in the pending chancery suits and attachment proceedings in which they are complainants and plaintiffs. The pleadings in the chancery suit brought by H. C. Gilmer, receiver of Cheves Lumber Co., against Fireproof Wood Products Corporation are sufficient to support a confession thereon of the judgment which Boger authorized Wysor to confess in his favor; and the petitions in the several attachment proceedings are sufficient to support a confession thereon of the judgments which Boger authorized Wysor to confess in favor of the plaintiffs therein. The confessions of judgment signed by Wysor as attorney in fact for Boger do not state on their face that they were confessed, respectively, in that chancery suit and those attachment proceedings, but they are to be read together with and interpreted in the light of the power of attorney in pursuance of which they were made. When so read and interpreted, there can be no doubt, we think, that the confession of judgment in favor of Gilmer, receiver of Cheves Lumber Company, was made in the chancery suit brought by him against Fireproof Wood Products Corporation, Boger and others, and that each of the confessions of judgment in favor of the four parties who had sued out attachments was made in the pending attachment proceeding brought by the named judgment plaintiff against Boger. The clerk so understood the confessions, and correctly entered the judgments accordingly.

As to the other six judgments the situation is different.

The power of attorney authorizes Wysor to confess these judgments in the pending chancery suits and attachment proceedings in which the parties in whose favor they were to be confessed are complainants or plaintiffs. But none of these parties had filed a petition for attachment. The only chancery suit in which any of them was a complainant was the injunction suit; and, as we have seen, the pleadings in that suit do not allege any cause of action in favor of any of these six parties against Boger upon which to confess a judgment. That is, there was no pending cause in which these six judgments could properly be confessed. The clerk seemed to have perceived this, and in entering these six judgments entered each of them as having been confessed in an action of assumpsit. We think he correctly solved the puzzle. These six judgments cannot properly be considered as having been confessed in any of the then pending proceedings.

The second contention made as to the validity and effect of the judgments is that all the judgments which were confessed in a pending suit, action, or proceeding at law are void, because where an action at law or suit in chancery is pending in a court, that court alone has the authority to enter a judgment or decree therein, and a judgment which is entered therein by the clerk of the court upon a confession of judgment made before him in his office is void. This contention is not well made. The statutes relating to confessions of judgment expressly authorize the confession of a judgment in the clerk's office in a pending suit or action. Section 6130, Code Va. 1919; Acts 1926, p. 744, ch. 448; Michie's Va. Code 1930, section 6130a.

The next contention is that the power of attorney given J. L. Wysor, when read in the light of the collateral agreement, did not authorize Wysor to confess the judgments confessed by him. The point here made is that the fact that the collateral agreement provided that the judgments confessed should be settled at less than fifty per cent of the face thereof, operated to destroy the power

and authority given Wysor to confess judgments for the full amounts stated in the power of attorney. The court correctly resolved this question. It in effect held that Wysor had the power and authority to confess the judgments for the amounts for which they were confessed; but that in the light of the collateral agreement, and the stipulation that the parties in whose favor they were confessed have accepted the terms of the collateral agreement as binding upon them, they were to be treated as judgments for the amounts for which the collateral agreement provided that they should be settled.

The last contention is that the judgments are void as to the appellants because they were confessed by Boger with intent to defraud the appellants, particularly Coleman, of what they were lawfully entitled to, or to delay them and hinder them from receiving what they were lawfully entitled to. See section 5184, Code Va. 1919.

Some of the evidence which we have heretofore set forth and certain other evidence which we have not mentiond raises a suspicion that this may have been so. Particularly is it a suspicious circumstance that Boger agreed with those in whose favor the judgments were confessed that the judgments should be confessed for more than double the amount for which at the same time they agreed that they should be settled. But the evidence falls short of being sufficient to establish that they were confessed with a fraudulent intent known to or participated in by those in whose favor they were confessed.

But though we are of opinion that all the judgments are valid judgments against Boger for the amounts for which it is provided in the collateral agreement that they shall be settled, and that they are not void as to the appellants on the ground that they were confessed with intent to delay, hinder, or defraud them, we think the court erred in the effect it gave to the judgments in its decree.

In considering the effect of the several judgments it is

necessary to distinguish between those confessed in favor of those who sued out attachments and those in favor of those who did not sue out attachments.

Only four of the parties in whose favor Boger confessed judgments had sued out attachments, W. F. White, D. A. Smith, receiver of Rocky Gap Flooring Co., Pulaski National Bank, and H. C. Gilmer, receiver of Fireproof Wood Products Corporation. The judgments confessed in favor of each of these four parties should have been given by the court the same effect as if the court on the evidence had entered a judgment in the attachment proceeding for the amount for which Boger compromised the judgment when he made it as shown by the collateral agreement, and no greater effect, except in so far as the confession of it is a waiver of errors in the proceeding in which it was confessed. This being true, in order to determine what amount each of the attachment plaintiffs is entitled to be paid from the fund in its hands, the court should have required the commissioner to state and settle, as of the day on which the attachment was served, the following accounts: (1) The accounts between Pulaski Veneer Corporation and B. C. Sales Company, Inc., (2) the partnership accounts of B. C. Sales Company, Inc., treated as a partnership composed of Coleman and Boger.

If upon such settlement anything should be found to have been on that day in the hands of Pulaski Veneer Corporation to which Boger was entitled, the attachment plaintiff is entitled to be paid out of the funds in the hands of the court such amount, or so much thereof as may be necessary to pay the amount he agreed, by accepting the terms of the collateral agreement, to accept in satisfaction of the judgment confessed in his favor.

But in this connection it is to be borne in mind that in settling the accounts to ascertain to what any attachment plaintiff is entitled, Boger must be charged with all sums which are to be paid out of the fund in the hands of the court to any attachment plaintiff whose attachment

takes priority over the attachment then under consideration.

The other seven parties in whose favor judgments were confessed did not sue out attachments. As has been heretofore indicated, the court should not have decreed that any of these parties is entitled to have any part of the funds in the hands of the court applied to the payment of his claim, or judgment, until and unless upon a final settlement of accounts between Pulaski Veneer Corporation and B. C. Sales Company, Inc., and of the partnership accounts of B. C. Sales Company, Inc., treated as a partnership, it should be found that Boger is entitled, as against Coleman and Pulaski Veneer Corporation, to receive a sum or sums in addition to those which he has received and those which may be ordered paid to the plaintiffs in the several attachment proceedings.

The decree entered in this consolidated cause on July 18, 1932, will be reversed, and the causes composing it will be remanded to the trial court for further proceedings, not in conflict with the views expressed in this opinion, to be had therein.

*Reversed and remanded.*